CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., Plaintiff,

v.

UNITED STATES of America, Defendant.

No. 97 CIV. 4366(MBM).

United States District Court, S.D. New York.

Sept. 3, 1998.

Frank Agostino, Calo Agostino, P.C., Brooklyn, NY, for Plaintiff.

Mary Jo White, United States Attorney for Southern District of New York, Amy Benjamin, Assistant U.S. Attorney, New York City, for Defendant.

## OPINION AND ORDER

MUKASEY, District Judge.

In this tax refund action, Consolidated Edison Company of New York, Inc. ("ConEd"), sues to recover approximately $31,000 in penalties it paid to the Internal Revenue Service ("I.R.S.") for having improperly received and used nontaxable diesel fuel. The parties now cross-move for a summary judgment pursuant to Fed.R.Civ.P. 56(c). For the reasons set forth below, ConEd's motion is denied, and the Government's motion is granted in part and provisionally denied in part.

## I.

The facts relevant to these motions are undisputed. ConEd is a New York-based utility company. (Pl. Rule 56.1 Statement ¶¶ 64–66) In the course of its business, it owns and leases diesel-powered highway vehicles. (*Id.* ¶ 67) These vehicles refuel at stations operated by ConEd, one of which is located in College Point, Queens. (*Id.* ¶ 73)

In late December 1996, ConEd contracted with Metro Fuel Oil Corporation ("Metro") to supply the College Point station with "clear" diesel fuel as needed during the following year. (*Id.* ¶ 82; Def. Rule 56.1 Statement ¶ 4) Clear diesel fuel is distinguished from "dyed" diesel fuel, *i.e.,* diesel fuel to which red dye has been added. This distinction is relevant for purposes of taxability, not combustibility; both types of fuel burn the same, but clear diesel is subject to federal excise taxes while dyed diesel is not. *See* 26 U.S.C.A. § 4082(a) (West Supp.1998). The dye enables the Government more easily to determine whether particular fuel has been taxed or not. Only businesses that use diesel for off-highway purposes, such as powering off-road equipment or generators, are permitted to hold or to use nontaxable, dyed diesel. *See* 26 U.S.C.A. §§ 4041(b), 6421(e) (West Supp.1998). As discussed more fully below, the I.R.S. can assess substantial penalties for the unauthorized receipt or use of dyed diesel fuel. *See* 26 U.S.C.A. § 6715(a), (b) (West Supp.1998). Because the vehicles that refueled at the College Point station were used for highway purposes, that station received only clear diesel fuel. (Pl. Rule 56.1 Statement ¶ 73) As a result, ConEd never instructed its station attendants there about the existence of dyed diesel or its tax consequences. (Def. Rule 56.1 Statement ¶ 19)

On January 23, 1997, ConEd placed its first order with Metro, directing it to deliver 2000 gallons of diesel fuel to the College Point station. (Pl. Rule 56.1 Statement ¶ 93) When a Metro employee receives an order, he fills out a delivery ticket that specifies the

type and quantity of fuel requested. (*Id.* ¶¶ 36, 49; Benjamin Decl. Ex. B) Each ticket has warnings on the front and back stating: " * *NOTE IF PRODUCT IS # 2, # 4 OIL OR OFF ROAD/RED DIESEL—THIS PRODUCT IS DYED DIESEL FUEL NONTAXABLE USE ONLY. PENALTY FOR TAXABLE USE." (Benjamin Decl. Ex. B) "# 2" and "# 4" oil are varieties of "high sulfur" diesel fuel, a type of diesel commonly used to power off-highway equipment and generators. (Pullo Decl. ¶ 7) However, both "high" and "low" sulfur diesel may be dyed red and used for nontaxable purposes.

In this case, Metro initially prepared ConEd's delivery ticket with the correct understanding that ConEd had ordered only clear diesel fuel. Thus, the ticket indicates, in a box labeled "PRODUCT* *," that ConEd was to receive "L.S. DIESEL," or low sulfur diesel, rather than "RED L.S. DIESEL," as a Metro employee usually writes when a customer orders red-dyed low sulfur diesel. (Benjamin Decl. Ex. B; Pl. Rule 56.1 Statement ¶¶ 51, 96) Similarly, in a box labeled "TAXES," which is not filled in when a customer orders dyed diesel fuel, the ticket states that ConEd was to pay "8.25%/[$]46.85." (*Id.* ¶ 97) Both notations appear in standard type. (Benjamin Decl. Ex. B)

Despite these notations, a Metro employee mistakenly placed ConEd's delivery ticket among the tickets prepared for customers ordering dyed diesel fuel. (Pl. Rule 56.1 Statement ¶ 98) Once included in that group, the ConEd ticket was stamped "RED DYED." The stamp appears in the center of the ticket, in bright red 18–point letters. (Benjamin Decl. Ex. B)

The following morning, Friday, January 24, 1997, James Russell, an employee of Metro's delivery agent, picked up ConEd's delivery ticket and, in accordance with the "RED DYED" stamp, loaded his tanker truck with dyed diesel fuel. (Pl. Rule 56.1 Statement ¶¶ 60, 99–101) When Russell arrived at the College Point station later that morning, he presented the delivery ticket to a ConEd supervisor, who briefly inspected it, and then referred Russell to Leonard Bertucco, an employee in charge of accepting fuel deliveries. (*Id.* ¶¶ 104–06; Russell Dep. at 30) Bertucco directed Russell to pump the fuel into the College Point station's diesel storage tank. (Pl. Rule 56.1 Statement ¶ 107) Russell never orally told Bertucco or any other attendant at the station that he was delivering dyed diesel fuel, and no ConEd employee ever asked if the fuel was dyed. (*Id.* ¶ 119; Def. Rule 56.1 Statement ¶ 6) The storage tank and pumps are constructed such that the diesel cannot be seen from the outside, so no one at the College Point station could see the color of the fuel during the pumping process. (Pl. Rule 56.1 Statement ¶¶ 112, 123)

Once the fuel had been transferred to the storage tank, Russell handed Bertucco the delivery ticket, which Bertucco briefly scanned to insure that it reflected the amount of fuel actually received. (*Id.* ¶ 114) Bertucco then signed the ticket, apparently without noticing the "RED DYED" stamp. (*Id.* ¶ 115) After the transaction was complete, Russell gave Bertucco a yellow carbon copy of the ticket, which did not have the phrase "RED DYED" stamped on it. (*Id.* ¶¶ 116, 171)

Russell returned to Metro's facility a few hours later and gave the original delivery ticket to his dispatcher, Joseph Ricciardella, who quickly realized that ConEd had received the wrong kind of diesel fuel. (*Id.* ¶¶ 124–25) Ricciardella immediately called a tank cleaning company and directed it to go right over to College Point station in order to clean the diesel storage tank. (*Id.* ¶ 126) He then called the station itself and told a ConEd employee "to close [the] pumps down. There is a problem." (Ricciardella Dep. at 11) A short time after receiving Ricciardella's warning, ConEd shut down the pumps and cordoned them off with bright yellow tape. (Pl. Rule 56.1 Statement ¶ 132)

Meanwhile, Carl Suares, a Dyed Diesel Compliance Officer employed by the I.R.S., had arrived at Metro's facility to conduct a routine inspection of its fuel and records. (*Id.* ¶ 133) Suares soon learned that Metro had erroneously delivered dyed diesel to the College Point station. (Suares Dep. at 29–30) Metro's president, Paul Pullo, hastily informed Suares that the delivery was Metro's

fault and that ConEd was "blameless." (Pullo Decl. ¶ 82) Nevertheless, Suares stated that he was going to the College Point station, and requested that Pullo and Ricciardella accompany him. (Pl. Rule 56.1 Statement ¶ 134) Suares also instructed Pullo to call the tank cleaning company and tell them not to clean the diesel storage tank until he had arrived. (*Id.*) Pullo did so.

Upon arriving at the College Point station, Suares identified himself as an I.R.S. agent and presented I.R.S. Notice 916 to the supervisor on duty. The notice states that, pursuant to 26 U.S.C.A. § 4083(c) (West Supp. 1998) and the regulations promulgated thereunder, authorized I.R.S. officials may inspect diesel fuel samples for dye and that failure to allow such inspection will result in a $1000 fine. (Suares Dep. at 46; Agostino Decl. Ex. C) Suares then inspected and took a sample from the diesel storage tank. (Pl. Rule 56.1 Statement ¶ 136) He informed ConEd that he would return the following Monday, January 27, 1997, to test its highway vehicles and that, in the meantime, ConEd's drivers were to refrain from using those vehicles or cleaning out their tanks. (*Id.* ¶ 138) When Suares returned the following Monday, he collected fuel samples from all the vehicles that had refueled from the diesel storage tank on the previous Friday. (Beers Dep. at 51–52)

Laboratory tests conducted a few days later revealed dye in the samples taken from both the diesel storage tank and 11 of ConEd's highway vehicles. (Suares Decl. Ex. A) Acting under 26 U.S.C.A. § 6715, the I.R.S. assessed $31,000 in civil penalties against ConEd: $20,000 for holding dyed diesel in the storage tank and $1000 for each of the 11 vehicles that had refueled with dyed diesel. (Suares Decl. ¶¶ 6–7, Ex. A) Officials at Metro state that they later called the I.R.S. and were informed that a penalty had been assessed against ConEd. (Torre Decl. ¶ 5; Pullo Decl. ¶ 94) ConEd claims that it never consented to this disclosure. After paying the penalty and accumulated interest, ConEd filed an administrative appeal with the I.R.S., arguing that it should not be punished for what was essentially an inadvertent act. (Compl.Ex. C) When that appeal

was denied, ConEd brought this refund action.

## II.

ConEd raises three main arguments in its motion for summary judgment. First, it contends that it should not be penalized under § 6715 because it neither intended that Metro deliver the dyed diesel nor profited from the delivery. Second, ConEd contends that, regardless of whether it may be made to pay a penalty, the $31,000 penalty actually imposed was excessive. Finally, it argues that, if its motion is denied, it should be given leave to file a separate motion to exclude the laboratory test results on the ground that Suares' search of the College Point station and confiscation of fuel samples violated the Fourth Amendment's prohibition on illegal searches and seizures. The Government has cross-moved for summary judgment dismissing the complaint.

### A. *ConEd's Liability Under § 6715*

 ConEd's principal argument is that it should not be punished for a delivery mix-up that it neither intended nor caused. On its face, this is a compelling argument. Common sense dictates that a taxpayer in ConEd's position should be allowed to return the dyed diesel fuel, or to pay taxes on it, without being made to pay an additional penalty. However, ConEd's liability is not governed by common sense; it is governed by the Internal Revenue Code, under the terms of which ConEd was properly penalized.

The gist of ConEd's argument is that it did not have the requisite state of mind to justify imposition of a penalty under 26 U.S.C.A. § 6715. Section 6715 provides in relevant part:

(a) **Imposition of penalty.**—If—

. . . .

(2) any dyed fuel is held for use or used by any person for a use other than a nontaxable use and such person knew, or had reason to know, that such fuel was so dyed ... then such person shall pay a penalty in addition to the tax (if any).

26 U.S.C.A. § 6715(a). Thus, a taxpayer will be penalized if he: (1) held for use or used

diesel fuel for taxable purposes; and (2) knew or had reason to know that such fuel was dyed. As there is no dispute that ConEd held and used dyed diesel fuel at its College Point station for a taxable purpose, the key issue is whether ConEd, through its station attendants at College Point, knew or had reason to know that the fuel was dyed. I find that it did.

This finding derives from the undisputed fact that the delivery ticket presented by Russell was stamped "RED DYED" in bright red 18–point letters. Although the ticket contained other information that might indicate a delivery of clear diesel, the "RED DYED" stamp is the biggest, most visible piece of information on the ticket. Thus, it is irrelevant that the color of the fuel was not visible during the pumping process or that Russell did not tell the College Point attendants that he was delivering dyed diesel. The conspicuous "RED DYED" stamp was sufficient by itself to alert ConEd's employees to the presence of dyed diesel.

ConEd's arguments to the contrary are unpersuasive. It contends first that neither the supervisor who inspected the delivery ticket nor Bertucco, the station attendant who signed it, ever saw the "RED DYED" stamp. In fact, ConEd states that because Bertucco had accepted diesel fuel deliveries without incident for many years, he did "not generally read delivery tickets." (Pl. Reply Mem. at 9) I note at the outset that Bertucco himself contradicted this statement by testifying that he reads delivery tickets to ensure that the correct amount of fuel has been delivered. (See Bertucco Dep. at 42) In any event, ConEd's argument would be persuasive only if § 6715 required actual knowledge that dyed fuel is present. However, a taxpayer is liable under that statute if he either "knew"—actual knowledge—or "had reason to know"—constructive knowledge—that he was holding or using dyed diesel fuel. 26 U.S.C .A. § 6715(a)(2). Here, regardless of whether Bertucco and his supervisor paused to read the whole delivery ticket, they had constructive knowledge of the presence of dyed diesel by virtue of the "RED DYED"

stamp. That Bertucco may have received diesel deliveries in the past without incident does not excuse his alleged failure to read the ticket or to notice that the words "RED DYED" were conspicuously stamped on it.

■ ConEd argues next that, even if its employees had noticed the "RED DYED" stamp, they would not have appreciated its significance because they had never received any training about the significance or tax consequences of using dyed diesel. (See Bertucco Dep. at 19) ConEd asserts also that it had no obligation to provide such training, either under Treasury Department Regulations or as a matter of prudent business practice, because it purchased only clear diesel fuel for the College Point station. (See Pl. Mem. at 49–50) Although ConEd's point is well-taken, it is also immaterial. Under § 6715, once it is established that a taxpayer held for use or used dyed diesel fuel for a taxable purpose, the only pertinent question is whether the taxpayer "knew, or had reason to know" that such fuel was dyed. 26 U.S.C.A. § 6715(a)(2). It is irrelevant under the statute that the taxpayer did not appreciate the legislative goals served by dying diesel, did not recognize the illegality of using dyed fuel for taxable purposes, or did not understand what exactly a "taxable purpose" is.[1] Consequently, ConEd's assertion that its station attendants at College Point lacked "familiarity with the dyed diesel fuel regulations" is beside the point. (Pl. Mem. at 49) The key issue is whether those attendants, and therefore ConEd, knew or had reason to know that the diesel was dyed. As discussed above, that question must be answered in the affirmative.

### B. Severity of the Penalty

ConEd claims next that the $31,000 penalty was excessive. Penalties assessed under § 6715(a) are calculated in accordance with subsection (b) of that statute, which provides in pertinent part:

(b) **Amount of Penalty.**—

 (1) **In general** . . . . [T]he amount of the penalty under subsection (a) on each act shall be the greater of—

---

1. Accordingly, I need not reach the Government's alternative argument that the warnings

on the delivery ticket adequately advised ConEd of the tax consequences of using dyed diesel.

(A) $1,000, or

(B) $10 for each gallon of the dyed fuel involved.

26 U.S.C.A. § 6715(b).

As noted, the $31,000 penalty assessed against ConEd consisted of two parts. First, the I.R.S. fined ConEd $20,000 for the "act" of holding 2000 gallons of dyed diesel for use at the College Point station. It arrived at this figure by multiplying 2000 gallons by $10 a gallon, which yielded a total greater than the alternative penalty of $1000. (*See* Suares Decl. ¶ 6) Second, the I.R.S. fined ConEd $11,000 for actually using the dyed diesel in 11 of its highway vehicles. It arrived at this figure by multiplying each of the 11 vehicles by $1000. (*See id.* ¶ 7) It did not apply the $10 per gallon provision because each vehicle had a fuel capacity of less than 100 gallons. (*See id.*)

ConEd challenges the calculation of this penalty on four separate grounds, none of which has merit. First, it contends that, under the language of § 6715, the I.R.S. should have imposed only one $20,000 penalty for the "collective" act of holding and using 2000 gallons of dyed diesel and should not have imposed separate penalties for the individual acts of holding and using such fuel. (Pl. Reply Mem. at 23) This argument is flawed textually and logically. 26 U.S.C.A. § 6715(b). Section 6715(b) directs the I.R.S. to penalize a taxpayer for "each act" committed in violation of § 6715(a). Section 6715(a), in turn, describes two discrete acts: holding dyed diesel for a taxable purpose and actually using the fuel for such a purpose. 26 U.S.C.A. § 6715(a). Thus, under the statute's plain language, a taxpayer successively violates § 6715—and is subject to successive penalties—each time it holds and/or uses dyed diesel. This reading of § 6715 also comports with common sense. Under ConEd's view of the law, a taxpayer who illegally received a given quantity of dyed diesel and repeatedly used it to power its highway vehicles would be subject to the same "collective" penalty as a taxpayer who received the same quantity of fuel but, because of a change of heart, never used any of it.

Second, ConEd argues that it cannot be penalized for 11 acts of using dyed diesel because its drivers had no way of knowing that they were putting dyed fuel into their vehicles and therefore lacked the requisite state of mind. (*See* Pl. Reply Mem. at 21–22) Contrary to the assumption underlying this argument, the state of mind of ConEd's individual drivers is not relevant to determining ConEd's liability in this case. Regardless of what these drivers knew, ConEd's agents knew that its highway vehicles received fuel at the College Point station (*See* Irwin Decl. ¶¶ 7, 9) and had reason to know that, on January 24, 1997, the diesel storage tank there had been filled with dyed diesel. Thus, ConEd itself had reason to know that some of its vehicles would receive dyed diesel that day. To hold otherwise would mean that any diesel-consuming company could avoid liability under § 6715 simply by ensuring that its employees did not know they were using dyed fuel.

Third, ConEd argues that the $31,000 penalty does not accurately reflect that the delivery of dyed diesel was an innocent mistake on Metro's part and that both Metro and ConEd "were models of tax and corporate compliance" once they discovered the problem. (Pl. Mem. at 50; Pl. Reply Mem. at 17) However, regardless of whether Metro intended to deliver dyed diesel and despite the laudable haste with which Metro and ConEd acted to rectify the mistake, the fact remains that dyed diesel was found at the College Point station. Although one could imagine a statutory scheme in which a taxpayer's good intentions were a mitigating factor in the computation of a penalty, § 6715 does not create such a scheme. Once the I.R.S. discovers that a taxpayer has made unauthorized use of dyed diesel, it "shall" assess a penalty, 26 U.S.C.A. § 6715(a), and that penalty "shall" be the greater of $1000 per act or $10 per gallon of dyed diesel. *Id.* § 6715(b). This mandatory language left the agency with no discretion to reduce ConEd's penalty on the basis of Metro's innocence or the parties' prompt remedial actions.

Finally, ConEd argues that, in calculating the $31,000 penalty, the I.R.S. improperly failed to take into account Suares'

"inappropriate conduct," including his willingness to ground ConEd's fleet of vehicles over the January 25–26, 1997, weekend. (*Id.* at 17–20) ConEd argues also that Suares violated its privacy rights by directing Metro officials to accompany him to the College Point station and that the I.R.S. compounded this injury by revealing the $31,000 penalty to Metro. Assuming for the moment that these actions were improper—a point the Government hotly contests—ConEd's argument is nonetheless without merit. Just as there is no statutory basis for reducing ConEd's penalty in recognition of its own prompt remedial actions, so too there is no statutory basis for reducing the penalty because of agency misconduct. *See* 26 U.S.C.A. § 6715. This is not to say that improper behavior on the part of I.R.S. agents should be tolerated. However, if ConEd truly believes that it is entitled to monetary compensation as a result of the conduct described above, it can pursue such relief in a separate civil action. *See* Federal Tort Claims Act, 28 U.S.C. 1346(b), 2671 *et seq.* (1994); *see also* 26 U.S.C. § 7431(a)(1) (1994) (permitting a taxpayer to bring an action against the Government for the unauthorized disclosure of tax information); *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (recognizing a cause of action against federal agents for deprivation of constitutional rights). Moreover, even if the I.R.S.'s actions were grounds for some sort of equitable reduction in the amount of ConEd's penalty, ConEd did not argue this point to the I.R.S. at its administrative appeal. (*See* Compl. Ex. C) It would be improper for the court to reduce ConEd's penalty to compensate it for Suares' alleged misconduct where the agency assessing the penalty was never given the opportunity to do so in the first instance. *See Stern v. United States,* 949 F.Supp. 145, 149 (E.D.N.Y.1996).

## C. *Exclusion of the Diesel Samples*

ConEd's final argument in support of its refund action is somewhat more substantial than its first two. ConEd informs the court that, if its present motion for summary judgment is denied, it intends to file a motion to exclude the laboratory test results on the ground that Suares obtained the diesel samples in violation of the Fourth Amendment. (*See* Pl. Mem. at 45 n. 3; Pl. Reply at 24) Although ConEd has not clearly articulated the basis for this prospective motion, I surmise from its papers that it intends to contest the constitutionality of 26 U.S.C.A. § 4083(c), at least as applied in this case. (*See* Pl. Reply Mem. at 18 n. 6) As noted above, that statute authorizes the I.R.S. to conduct a warrantless search of any business that stores diesel fuel for a taxable purpose and to levy a $1000 fine on any such business for impeding the search. 26 U.S.C.A. § 4083(c). ConEd argues that, if the test results are excluded, there is no evidence to support the presence or use of dyed diesel at the College Point station and therefore no basis for assessing a penalty under § 6715.

At present, the Government does not dispute that the Fourth Amendment applies to investigations that culminate in a civil tax penalty. *See Pizzarello v. United States,* 408 F.2d 579, 586 (2d Cir.1969) (holding that evidence illegally seized by the I.R.S. in a criminal investigation could not be used in later civil tax proceedings); *see also Tirado v. Commissioner,* 689 F.2d 307, 311 (2d Cir. 1982) (stating that "courts routinely prohibit governmental authorities from using illegally seized evidence in the proceedings for which the search was conducted, not only in a criminal prosecution"). Nor does it presently argue that Suares' warrantless search of the College Point premises pursuant to § 4083(c) fell within some exception to the general warrant requirement. *Cf. Lievesley v. Commissioner,* 985 F.Supp. 206, 208 (D.Mass. 1997) (holding that a warrantless, routine search of a diesel-powered truck was permissible under a "closely regulated industry" exception to the warrant requirement). Instead, the Government's sole contention at this point in the litigation is that, even if the results were excluded, there is other independent evidence in the record to support the imposition of the penalty. (*See* Def. Mem. at 15) I agree partially with this argument.

The Government's argument is correct insofar as it pertains to the $20,000 penalty imposed on ConEd for holding dyed

diesel for use at its College Point station. The record is replete with evidence independent of the test results that ConEd held such fuel for a taxable use. (*See* Benjamin Decl. Ex. A, at 4, 7–8 & Ex. B; Bertucco Dep. at 47; Beers Dep. at 49–53; Russell Dep. at 16) Further, the amount of the dyed diesel is conclusively established, not by the test results, but by the delivery ticket which Bertucco himself signed. (*See* Benjamin Decl. Ex. B)

ConEd does not seriously contest the existence of independent evidence justifying the $20,000 portion of its penalty. Rather, ConEd argues that, assuming the test samples were improperly seized, then all of this evidence should be excluded as "fruit of the poisonous tree." In other words, ConEd argues, were it not for the allegedly illegal search, it would not have filed this refund action; and were it not for this refund action, none of the evidence to which the Government points would have been produced.

 As the Government points out, however, the fruit-of-the-poisonous-tree doctrine does not operate to exclude evidence obtained as a result of a party's "intervening independent act of free will." *United States v. Trzaska*, 111 F.3d 1019, 1027 (2d Cir.1997) (quotations omitted). Contrary to the thrust of ConEd's argument, the question of whether a party acted out of free will does not turn on a simple "but-for" analysis. *See United States v. Thompson*, 35 F.3d 100, 105 (2d Cir.1994). Instead, "[t]o determine whether a [party's] actions are a product of free will, a court should consider how close in time the illegal search occurred to the [party's] actions, the presence of intervening circumstances and the purpose and flagrancy of the official misconduct." *Trzaska*, 111 F.3d at 1027.

I have little trouble concluding, in accordance with the *Trzaska* analysis, that the evidence disclosed during this tax refund action was purged of the taint of the allegedly illegal search and seizure. First, ConEd brought this action almost six months after the search of the College Point premises. Second, in the interim, ConEd had ample opportunity to consult counsel and devise its litigation strategy, which, at least at the administrative level, did not include an argument that the test samples were illegally seized. Finally, there is no evidence that Suares acted with a bad purpose in searching the College Point station or that the search included conduct that even comes close to the flagrant behavior that would justify exclusion of the evidence underlying this refund action. *See id.* Thus, the documentary evidence and deposition testimony disclosed in this action are admissible on the question of whether ConEd held or used dyed diesel. Because that evidence indisputably shows that ConEd held 2000 gallons of dyed diesel for use at its College Point station, exclusion of the test results would not relieve ConEd of that portion of its penalty.

 However, the same cannot be said for that portion of the penalty related to ConEd's use of dyed diesel in 11 of its highway vehicles. The Government points out that Robert Beers, an employee at the College Point station, confirmed that between 10 and 20 vehicles had fueled up at the College Point station at some time on January 24, 1997 (*See* Beers Dep. at 51–52) and that ConEd itself admitted in its administrative appeal that it used "some red dyed fuel in its trucks." (Compl.Ex. C) However, although these statements may independently establish that "some" of ConEd's vehicles used dyed diesel for a taxable purpose, the Government has pointed to no evidence other than the test results themselves that specifically show that 11 of ConEd's vehicles did so. If, as the Government is willing to assume for purposes of this motion, those results must be excluded from evidence, there would appear to be no other independent evidence specifically supporting the $11,000 penalty. Accordingly, contrary to the Government's position, the results of ConEd's as-yet-to-be-filed suppression motion may be relevant to a determination of its liability under § 6715.

\* \* \* \* \* \*

For the above reasons, ConEd's motion for summary judgment to recover its tax penalty is denied. The Government's motion for summary judgment dismissing the complaint is granted with respect to the portion of the tax penalty related to ConEd's storage of

2000 gallons of dyed diesel, but is provisionally denied with respect to that portion related to the use of dyed diesel in 11 of ConEd's highway vehicles. Assuming the parties are unable to reach a compromise on this aspect of the penalty, ConEd will have until September 18, 1998, to file a motion to exclude the test results, failing which the Government's present motion will be granted in its entirety.

SO ORDERED: