In re FM TRANSMIX CORP., Debtor.

Bankruptcy No. 095–72050–511.

United States Bankruptcy Court, E.D. New York.

Feb. 9, 1999.

Weinberg, Kaley, Gross & Pergament, Garden City, New York, by Marc Pergament, Marc J. Weingard, for debtor.

United States Department of Justice, Washington, D.C., by Jennifer Blunt, Christine Grant, for the Internal Revenue Service.

**584**

*DECISION AFTER EVIDENTIARY HEARING*

*(Motion to Reduce/Expunge Claim Number 36 Filed by the Internal Revenue Service)*

MELANIE L. CYGANOWSKI, Bankruptcy Judge.

FM Transmix Corp. ("FM" or the "Debtor") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on July 26, 1995. On September 10, 1996, the Debtor moved for an Order expunging or reducing claim number 36 filed by the United States Department of the Treasury, Internal Revenue Service (the "IRS"), which includes a $45,000 tax penalty [1] assessed against the Debtor pursuant to 26 U.S.C. § 6715 [2] for the improper use of dyed diesel fuel. The Debtor contends that it did not know or have reason to know that it was using the dyed diesel fuel for an improper purpose and that, as a consequence, the penalty is not warranted. Alternatively, the Debtor asserts that the assessment of $45,000 exceeds the statutory mandate. For its part, the IRS contends that the Debtor knew or should have known that it was holding and using dyed diesel fuel for an improper purpose and that the penalty is appropriate.

1. Claim number 36, filed by the IRS on August 23, 1996, is an administrative claim in the amount of $45,252.20. This claim includes the penalty at issue as well as a vehicle tax in the amount of $252.20 which is not the subject of this motion. Subsequent to this motion being filed, the IRS amended their claim and, as a consequence, claim number 36 has been superseded by claim number 43, filed by the IRS on April 9, 1997. Claim number 43 is in the amount of $58,362.50 and includes the penalty at issue and a variety of other tax claims not germane to this motion.

2. The penalty was originally assessed against the Debtor pursuant to 26 U.S.C. § 6714[5]. However, pursuant to revisions of the Internal Revenue Code in 1996, Section 6714 has been renumbered and is now Section 6715.

3. During the evidentiary hearing, the Court heard the testimony of Frank Locasio, Linda Disonda, Frank Ottomanelli, Guilio Marini and Carl Suarez. The Court received into evidence Exhibits 1–31, 32 (for limited purposes), 33, 33A–36A, 34–37.

The Court conducted an evidentiary hearing which took place over two non-consecutive days. [3] For the reasons that follow, the Court agrees with the Debtor that it did not know or have reason to know that it was using dyed diesel fuel for an improper purpose and, accordingly, that part of the IRS claim relating to the $45,000 penalty is expunged in its entirety. This Decision constitutes the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure ("FRBP").

*Underlying Facts*

The Debtor is in the business of manufacturing, selling and delivering cement for commercial and residential construction projects located throughout the New York metropolitan area. *See* Parties' Joint Pre–Hearing Statement ("Joint Statement") ¶ C1. Debtor, for the most part, operates year-round, but has less production during the winter months as the weather gets colder. *Id.* at 18. In order to deliver cement to its customers, the Debtor uses 15 diesel-powered trucks. *Id.* at 17. Prior to February 23, 1996, the diesel fuel used to power Debtor's trucks was delivered to Debtor's place of business and stored in an underground 3,000-gallon tank. [4] *Id.*

4. The diesel fuel used to power Debtor's trucks is "clear" taxable diesel fuel which is legal for motor vehicle use. Clear diesel fuel

is distinguished from "dyed" diesel fuel, *i.e.*, diesel fuel to which red dye has been added. This distinction is relevant for purposes of taxability, not combustibility; both types of fuel burn the same, but clear diesel is subject to federal excise taxes while dyed diesel is not. *See* 26 U.S.C.A. § 4082(a) (West Supp.1993). The dye enables the Government more easily to determine whether particular fuel has been taxed or not. Only businesses that use diesel for off-highway purposes, such as powering off-road equipment or generators, are permitted to hold or to use nontaxable, dyed diesel. *See* 26 U.S.C.A. §§ 4041(b), 6421(e) (West Supp.1998).

*Consolidated Edison Co. of New York, Inc. v. United States,* 34 F.Supp.2d 160, 162 (S.D.N.Y. 1998).

From time to time, the Debtor also uses "dyed" diesel fuel to heat Debtor's buildings and produce hot water. Trial Tr. (March 6) at 57. To lessen confusion, "dyed" diesel fuel and "clear" diesel fuel will simply be referred to herein as "heating fuel" and "diesel fuel," respectively.

Within the immediate vicinity of the 3,000-gallon tank is a smaller 500-gallon tank, also underground. That tank, according to Frank Locasio ("Locasio"), Debtor's vice president, was used to store "heating fuel for a boiler that isn't used [in the non-winter months]."[5] *Id.* at 25. Debtor also has other above-ground tanks used for storing heating fuel. Trial Tr. (March 6) at 16; 37. Like the diesel fuel, prior to February 23, 1996, the heating fuel was also delivered to Debtor's place of business.

Both diesel fuel and heating fuel were delivered to Debtor's place of business by Montebello Coal & Fuel Oil Corp. ("Montebello") during the period November 1, 1995 through January 30, 1996.[6] *See* Joint Statement ¶ C2. Diesel fuel and heating fuel were pumped into the underground tanks by Montebello through two separate fill tubes; one for each tank. Trial Tr. (March 6) at 32; Trial Exhs. 33 and 34. Locasio testified that a person could not actually see the color of the fuel being pumped into the underground tanks because the hose from the delivery truck was placed directly into the tanks' fill tubes. Trial Tr. (March 6) at 33–34. During this period, the Debtor also used hoses (which concealed the fuels' color) to pump diesel fuel into the trucks (*id.* at 28) or to extract heating fuel. The Debtor only utilized one barrel "for drip" for the two hoses to prevent spillage of fuel. Trial Tr. (April 1) at 243. Prior to February 26, 1996, the two fill tubes for the two underground tanks were virtually identical, being the same color (*id.* at 209) and within a few feet of each other. Trial Exhs. 33 and 34.

At the hearing, Frank Ottomanelli ("Ottomanelli"), the president of Montebello, explained that his company is a full service business, doing "anything pertaining to the heating business." Trial Tr. (March 6) at 77.

Montebello first started delivering diesel fuel in 1994 and remained in that business exclusively for approximately two years, after which it began delivering different types of fuel. *Id.* at 78. Ottomanelli testified that despite the periodic delivery of different types of fuel, the trucks were always pumped clean with no evidence of the prior fuel remaining. *Id.* at 111.

Montebello first began delivering heating fuel to FM in December 1995 and, as this was a new account, neither Ottomanelli nor his employees knew where Debtor's heating fuel tanks were located. *Id.* at 126. At about this time, Ottomanelli hired a new driver, Michael Wolinski ("Wolinski"), who was a "fuel oil driver for many years." *Id.* at 116–17. Ottomanelli testified that he explained to Wolinski the different types of fuel that Montebello delivered to its customers (*id.* at 124) and that he wanted the delivery tickets signed, if possible. *Id.* at 121. The documents show that Wolinski delivered the heating fuel to the Debtor on December 11, 1995, but that the delivery ticket was not signed. Trial Exh. 19.

Ottomanelli further testified that Wolinski could have gone to a number of terminals to pick up the heating fuel that was delivered to FM on December 11, 1995. Trial Tr. (March 6) at 142. Although Ottomanelli did not accompany Wolinski to the terminal, he believes Wolinski picked up heating fuel because Ottomanelli received a pick-up ticket for the purchase. *Id.* Wolinski ultimately left his employment with Montebello in April 1996 and did not return the following season.[7] *Id.* at 128.

Ottomanelli acknowledged that Montebello was required to indicate, on each delivery ticket, the specific type of fuel being delivered. *Id.* at 131. The invoices and delivery

---

5. Although FM uses diesel fuel throughout the year to power its trucks, heating fuel was only used in the winter months to heat Debtor's facilities and to produce hot water used in manufacturing the cement during cold weather. *Id.* at 43. The water is only heated in the winter months to prevent the cement from freezing while it is being delivered to Debtor's customers. *Id.*

6. Montebello delivered diesel fuel to the Debtor on November 1, 1995 (1991.7 gallons) and December 23, 1995 (2000.7 gallons). Trial Exhs. 17 and 20. Additionally, Montebello delivered heating fuel to the Debtor on December 11, 1995 (1200 gallons), December 30, 1995 (1101.5 gallons) and January 30, 1996 (1206 gallons). Trial Exhs. 19, 21 and 22. January 30, 1996 was the last time Montebello delivered fuel to the Debtor.

7. Wolinski did not testify at the trial.

tickets received into evidence at the hearing included both diesel fuel and heating fuel purchases for the period April 24, 1995 to January 30, 1996. Trial Exhs. 8–22. Some, but not all, of the diesel fuel delivery tickets contain the following prominent, stamped notation: "This Product Is Being Sold For On Highway Use Only ... Legal For Motor Vehicle Use...." [8]

In contrast, the heating fuel delivery tickets contain a less conspicuous, almost boilerplate, notice which states:

> This Product is Heating Oil (Dyed Fuel). Non–Taxable Use Only. Penalty For Taxable Use. Does Not Apply To Sales Tax, # 4 & # 6.

Trial Exhs. 19, 21 and 22. Of the three heating fuel delivery tickets received into evidence, two contain a type-written, prominent notice informing the Debtor that "deliveries will not be made to customers with balances over 30 days...." Trial Exhs. 21 and 22. This type-written message partially covers the heating fuel notice, rendering the notice virtually illegible. *Id.*

In addition, some of the *diesel fuel* delivery tickets contain *both* the boilerplate heating fuel notice *and* the diesel fuel notice. *See, e.g.,* Trial Exhs. 11 and 17. Some diesel fuel delivery tickets contain a partially edited or fully masked heating fuel notice. *See, e.g.,* Trial Exhs. 10 and 13. Most notably, however, one *diesel* fuel delivery ticket contains *only a heating* fuel notice. Trial Exh. 16.

The remaining distinguishing characteristics of the different types of fuel are the price and applicable taxes for each. This information is found on Montebello's invoices which, according to Linda Disonda ("Disonda"), Debtor's bookkeeper, were received by the Debtor approximately "a week" after the fuel delivery. Trial Tr. (March 6) at 62.

The diesel fuel invoices contain the notation "diesel fuel" and specify the federal excise, state excise and gross receipts tax. *See, e.g.,* Trial Exhs. 8 through 13. The heating fuel invoices, however, contain the notation "dyed # 2 fuel" but only specify gross receipts tax. *See, e.g.,* Trial Exhs. 19 and 22. As explained by Ottomanelli, "[h]eating oil is more expensive, but the clear diesel fuel is subject to more taxes" and therefore, in the end, more expensive. Trial Tr. (March 6) at 80.

Despite the difference in price, Locasio testified that, prior to February 23, 1996, he did not know there were different types of diesel fuel. Locasio stated that he never ordered fuel for the Debtor; he only "delegate[d] the authority to order fuel." [9] *Id.* at 18. He further testified that he had no control or oversight over Disonda, that he did not review the fuel invoices and that he "didn't verify whether or not FM Tranxmix [sic] was paying for the amount of fuel received." *Id.* at 55.

Both Disonda and Guilio Marini ("Marini"). Debtor's owner and founder, testified that although they knew there were different types of fuel, they did not know what the differences were. Disonda testified that she was FM's bookkeeper and was responsible for the accounts payable. Trial Tr. (March 6) at 68. When paying the fuel bills, Disonda would match up the delivery ticket with the appropriate invoice, make sure the amount was correct and remit payment. *Id.* at 70. She admits only being concerned with "quantities" and did not read all of the language on the invoices. *Id.* at 68–9. With respect to the different types of diesel fuel, Disonda testified:

> Q.: Just briefly, you weren't aware of the difference then between the prices re-

---

8. The diesel fuel delivery tickets which contain the quoted notation are Trial Exhibits 9, 10, 11, 13 and 17. The diesel fuel delivery tickets which did not contain the notation are Trial Exhibits 8, 12, 16 and 20.

9. On cross-examination, the IRS attempted to impeach Locasio with respect to his authority to authorized people to order fuel. The Court finds, based on a review of the testimony, that Locasio's deposition testimony and the testimony elicited at the hearing are not inconsistent. At his deposition, Locasio testified that FM "basically didn't bother [Locasio] with [ordering fuel] ... [b]ecause [Locasio] had many other things to do. It wasn't [his] job to worry about ordering fuel," Trial Tr. (March 6) at 48. At the hearing, Locasio testified that he "never ordered fuel", "it was not [his] responsibility to order fuel", and that he had "authority to authorize people to order fuel." *Id.* Contrary to the Government's urging, the Court does not Locasio's testimonies at odds with each other.

lating to clear fuel and dyed fuel; isn't that true?

A.: I'm not an expert in finding out which is which. All I know one there [sic] is more numbers on one versus the other. I never question anything.

Q.: Were you aware that there was a difference between prices of clear fuel and heating fuel?

A.: Yes, I see it now, oh, yes.

Q.: Were you aware at that time?

A.: I was aware at the time because I have to pay that. But not that I know why, the reasons, that I do not know.

Q.: When you received invoices for clear fuel, did you know that they were for clear fuel?

A.: No. I look at the quantity and the price, and that's really about it.

Q.: When you received invoices for clear fuel, did you notice that there was a stamp on some invoices for clear fuel?

A.: No.

Q.: That said "clear fuel"?

A.: No. I had no reason to do that, no.

Q.: Further language relating to the dyed fuel, were you aware that there was a stamp on the dyed fuel?

A. No.

Trial Tr. (March 6) at 72–3.

Marini, an Italian immigrant with a less than perfect command of the English language, concedes that, at times, he ordered the fuel from Montebello.[10] *Id.* at 151. Like Disonda, however, Marini insists that although he knew there was "oil for the trucks" and "oil for the heat", he did not know whether it was the same oil or different oil. *Id.* at 162. Marini also testified that Locasio would delegate to other employees the responsibility of ordering fuel when Mar-

ini was not available, thus corroborating Locasio's testimony.[11] *Id.* at 152–58.

***The Events of February 23, 1996***

On February 23, 1996, Carl Suarez ("Suarez"), an IRS Dyed Diesel Fuel Compliance Officer, spotted one of Debtor's trucks. After identifying himself as an IRS agent, Suarez presented IRS Notice 916 [12] to Debtor's driver. Trial Tr. (April 1) at 192–93. Suarez then proceeded to inspect the fuel by taking a sample from the truck's saddle tank. *Id.* at 193. The sample was "dark red" in color, prompting Suarez to take another sample using a pump. *Id.* at 194. He then "labeled it [the second sample], sealed it and ... asked [the driver] where the company is located." *Id.*

After obtaining the sample, Suarez followed the driver back to FM's place of business where he met Disonda. *Id.* at 203. Suarez again identified himself as an IRS diesel compliance officer, presented Disonda with IRS Notice 916, and informed her that he was there to conduct an inspection of the fuel, and asked if a manager was available. *Id.* at 204. He then met Locasio, and the three of them proceeded to the vicinity of the underground tanks to do the inspection. *Id.* at 206. When recalling what happened next, Suarez testified:

Q.: Where did you obtain the fuel from when you did the testing there?

A.: From the hose.

Q.: What color was the fuel when you tested it?

A.: Red.

Q.: And was this, to your knowledge, the place where the fuel was being pumped into the trucks?

A.: Yes, ma'am.

Q.: How do you know that?

---

**10.** Disonda is Marini's daughter and, in addition to serving as the Debtor's bookkeeper, also assists her father by translating for him.

**11.** Although there appears to be some discrepancies in Marini's testimony regarding Locasio's responsibilities for ordering fuel, the discrepancies are not material to the issues raised in the present motion. Additionally, these discrepancies appear to reflect Marini's difficulty with the English language.

**12.** IRS Notice 916, entitled "Dyed Diesel Fuel Inspection Notice", states that, pursuant to 26 U.S.C.A. § 4083(c) and the regulations promulgated thereunder, authorized IRS officials may inspect diesel fuel samples for dye and that failure to allow such inspection results in a $1000 fine. Trial Exh. 5.

A.: I asked them where they get the fuel for the trucks.

Q.: Who in particular, when you say you asked "them"?

A.: Frank and Linda Disanonda [sic] escorted me to the pump. And Frank is the one who opened up the pump for me and put the fuel into the jar.

Trial Tr. (April 1) at 210–11.

After sealing up the sample from the hose, Suarez then tested approximately three of Debtor's trucks which were in the area. *Id.* at 212. Once again, the fuel from each truck was red. Suarez did not test the remainder of the trucks because "it was late Friday afternoon, ... the area is not a good neighborhood ... [and t]hey were going to close anyway." *Id.* at 213. Before leaving, however, Suarez made several inquiries of the Debtor:

Q.: Did you ask whether or not all of the trucks received fuel from that particular pump?

A.: Yes, ma'am, that's what they told me.

Q.: Who did you ask?

A.: Frank Locasio. He indicated to me that's where the trucks fuel up.

*Id.*

Locasio's recollection of the events of February 23, 1996 differs somewhat. Locasio testified as follows:

Q.: Now on February 23 did you have any conversations with Mr. Suarez?

A.: Yes I did.

Q.: Did you have any conversations specifically with respect to heating oil and diesel fuel?

A.: Yes.

Q.: Could you tell the Court what you told Mr. Suarez at that time?

A.: I basically didn't tell him anything. He explained to me the difference in the color between the two fuels; and Linda [Disonda] didn't understand him. I says, "No, I understand what he's saying, it's a different color between the one and the other. And he says we have the wrong one."

Q.: Did Mr. Suarez specifically ask you a question about your knowledge about the different types of fuel?

A.: No, sir.

Trial Tr. (April 1) at 241–42.

For his part, Suarez was quite adamant in his testimony that Locasio was aware, as of their first conversation on February 23rd, that there were different types of diesel fuel:

Q.: At that point, what, if anything, did you say to Mr. Locasio?

A.: I asked both of them [Locasio and Disonda] for the name and the address of the company, and also the federal tax I.D. number.

Q.: Of their company?

A.: Yes.

Q.: Of FM?

A.: Yes, of FM Transmix. And, also, who did they buy fuel from. I needed to see the receipts from the diesel supplier. I noticed that when she gave Frank the notice 916, he read the notice, and he said I know about diesel fuel.

Q.: What do you mean? What exactly did he say?

A.: He said, he knows about the diesel fuel, different kinds of diesel fuel.

Trial Tr. (April 1) at 204–05.

### The Events after February 23, 1996.

On February 26, 1996, the United States Environmental Protection Agency ("EPA") arrived at Debtor's place of business to inspect the fuel. Trial Tr. (March 6) at 21. Locasio testified that the EPA agents explained the differences between the two fuels (id.) and made suggestions to protect against future errors. *Id.* at 26. At the request of the EPA agent, Locasio also prepared and executed a statement on February 26, 1996 which states, in its entirety:

I, Frank Locasio, hereby state, under the penalty of perjury pursuant to 28 U.S.C. Section 1746, the following: I was not aware that the trucks were using the wrong type of fuel. I did not know that there were different types of diesel fuel. I have read this document and agree that it is complete, truthful, and factually accurate

in all regards to the best of my knowledge and belief.

Trial Exh. 31; Trial Tr. (April 1) at 238–39.

Heeding the EPA's suggestions, Locasio immediately made certain remedial changes at the Debtor's premises: (1) the "dyed fuel" fill tube was painted red; (2) a fence surrounding the area around the two pumps was erected; (3) a second barrel for "drip" was added to separate the hoses that came from the underground heating fuel and diesel fuel tanks; and (4) a sign was posted that stated in large letters: "Off highway fuel for machine only. Dyed diesel fuel, not for trucks, 2/26/96." *Id.* at 25–27; Trial Exhs. 33–36.

Locasio could not specifically recall whether Suarez was present on February 26, 1996 when the EPA conducted its testing. Trial Tr. (April 1) at 239. Neither could Suarez. Initially, on his direct examination, Suarez testified that his next visit to the premises after February 23, 1996 was March 13, 1996. *Id.* at 214. On recross-examination, however, in testifying about an EPA Report dated February 26, 1996 (Trial Exh. 2), Suarez stated:

Q.: With respect to the document Ms. Blunt just showed you, were you there when EPA tested the trucks?

A.: Yes, sir.

Trial Tr. (April 1) at 232. In any event, Suarez confirmed that the physical changes suggested by the EPA were in place at the time of his second visit to the site, thus corroborating Locasio's testimony. *Id.* at 218–22.

### Subsequent Events

After the lab reports confirmed that the fuel in the tank and trucks was heating fuel, the IRS found the Debtor liable for a tax of $841.80. Joint Statement ¶ 5. The IRS also assessed the Debtor a $45,000 penalty [13] for holding and using non-taxable heating fuel for a taxable purpose. *Id.* at ¶ 9.

At the time of the meeting with the EPA agents on February 26, 1996, Locasio was told by the EPA that the tanks had to be

cleaned out, but when he asked the EPA agents how to clean the tanks, he was told that the EPA "can't tell you." Trial Tr. (March 6) at 41. It took the Debtor approximately a month-and-a-half to two months to clean the tanks. In order to ensure that none of its trucks would carry "tainted" fuel and to avoid any possible confusion during this time, the Debtor exclusively used a local Sunoco station to obtain diesel fuel for the trucks. *Id.* at 42.

Suarez testified that when he returned on March 13, 1996, the heating fuel was still in the tanks and the hose. Trial Tr. (April 1) at 215. However, he did not impose an additional penalty because steps were being taken by the Debtor and Marini, FM's owner, pleaded for more time to clean the tanks. *Id.* at 217. On Suarez' third visit (which was approximately three weeks after the second visit), everything was clean and Debtor was using the right type of fuel from its own tanks. *Id.* at 218.

### The Contentions of the Parties

The Debtor raises two arguments in support of its motion to expunge or reduce the IRS claim. First, the Debtor argues that the penalty is improper because it did not know, or have reason to know, that it was using heating fuel for an improper purpose. FM asserts that Montebello failed to properly notify it of the different types of fuel and the penalties imposed for improper use. Further, Debtor contends that Montebello mistakenly supplied the Debtor with heating fuel in its underground tank which was reserved for diesel fuel and that it had no way of knowing that this had occurred.

Second, FM contends that, regardless of whether the Court finds that it knew, or had reason to know, that it was using heating fuel for an improper purpose, the $45,000 penalty imposed by the IRS exceeds the statutory mandate. The $30,000 portion of the penalty was based on the 3,000 gallon capacity of Debtor's underground tank. But, the Debtor asserts that the tank contained, at most, 100–200 gallons of fuel, which is not challenged by the IRS with evidence to the contrary, and

---

13. The $45,000 penalty was calculated as follows: (i) $1,000 × 15 trucks which equals $15,000; and (ii) $10 × 3,000 gallons (the under- ground tank capacity) which equals $30,000. *See* IRS Trial Brief at 5–6.

that the maximum fine can be not more than $2,000. In addition, with respect to the $15,-000 portion of the penalty, the Debtor asserts that the IRS erred by counting each truck as a separate violation and urges that only one violation should result, mandating a maximum penalty of $1,000.

The IRS counters, alleging that FM knew or had reason to know that it was holding and using the heating fuel for an improper purpose. The IRS further asserts that the penalty, as imposed, was appropriate.

### DISCUSSION

The IRS assessed the $45,000 penalty against the Debtor pursuant to Section 6715 (formerly § 6714[5]) of the Internal Revenue Code. That section reads as follows:

§ *6715. Dyed fuel sold for use or used in taxable use, etc.*

(a) Imposition of penalty.—If—

(1) any dyed fuel is sold or held for sale by any person for any use which such person knows or has reason to know is not a nontaxable use of such fuel,

(2) any dyed fuel is held for use or used by any person for a use other than a nontaxable use and such person knew, or had reason to know that such fuel was so dyed, or

(3) any person willfully alters, or attempts to alter, the strength or composition of any dye or marking done pursuant to section 4082 in any dyed fuel,

then such person shall pay a penalty in addition to the tax (if any).

(b) Amount of penalty.—

(1) In general.—Except as provided in paragraph (2), the amount of the penalty under subsection (a) on each act shall be the greater of—

(A) $1,000, or

(B) $10 for each gallon of the dyed fuel involved.

(2) Multiple violations.—In determining the penalty under subsection (a) on any person, paragraph (1) shall be applied by increasing the amount in paragraph (1)(A) by the product of such amount and the number of prior penalties (if any) imposed by the section on such

person (or a related person or any predecessor of such person or related person).

(c) Definitions.—For purposes of this section—

(1) Dyed fuel.—The term "dyed fuel" means any dyed diesel fuel, whether or not the fuel was dyed pursuant to section 4082.

(2) Nontaxable use.—the term "nontaxable use" has the meaning given such term by section 4082(b).

(d) Joint and several liability of certain officers and employees.—If a penalty is imposed under this section on any business entity, each officer, employee, or agent of such entity who willfully participated in any act giving rise to such penalty shall be jointly and severally liable with such entity for such penalty.

The center of the instant controversy thus focuses upon whether the Debtor had the requisite state of mind to justify the imposition of a penalty pursuant to 26 U.S.C. § 6715(a)(2). As one court recently observed, "a taxpayer will be penalized if he: (1) held for use or used diesel fuel for taxable purposes; and (2) knew or had reason to know that such fuel was dyed." *Consolidated Edison Co. of New York, Inc. v. United States,* 34 F.Supp.2d 160, 164–65 (S.D.N.Y. 1998). Consequently, the Debtor here would be liable for the penalty "if [it] either 'knew'—actual knowledge—or 'had reason to know'—constructive knowledge—that [it] was holding or using dyed diesel fuel" for an improper purpose. *Id.*

As in *Consolidated Edison,* there is no dispute that the Debtor used dyed diesel fuel for a taxable purpose. The key issue is, however, whether the Debtor, through its agents, knew or had reason to know it was using the dyed diesel fuel for an improper purpose.

The facts of *Consolidated Edison* are somewhat similar, although not identical, to those here. *Consolidated Edison* was a tax refund action instituted by Consolidated Edison Co. of New York, Inc. ("ConEd") after it

paid a $31,000 penalty to the IRS which resulted from its alleged improper receipt and use of nontaxable diesel fuel. Nevertheless, the reasoning employed by United States District Judge Michael Mukasey in *Consolidated Edison* is instructive, particularly as it appears to be the only reported decision in the country that discusses Section 6715 of the Internal Revenue Code in the context of the improper use of dyed diesel fuel.

As set forth in *Consolidated Edison*, ConEd had its own refueling station in College Point, New York, where it stored only clear diesel fuel. Since only clear diesel fuel was used to power ConEd's highway vehicles, dyed diesel fuel was never stored at the College Point station. From time to time, ConEd placed an order for clear diesel fuel with its supplier Metro Fuel Oil Corporation ("Metro"). Although Metro originally prepared ConEd's delivery ticket with the correct information, on one occasion, a Metro employee mistakenly placed ConEd's delivery ticket with delivery tickets for dyed diesel fuel. Once included in this group, ConEd's delivery ticket was stamped "RED DYED" in bright red 18-point letters.

The morning after the order was placed, Metro's driver picked up ConEd's delivery ticket and, in accordance with the stamped notation, loaded his truck with dyed diesel fuel. When Metro's driver arrived at ConEd's station, he presented the delivery ticket to ConEd's supervisor who briefly inspected it and referred the driver to a ConEd employee in charge of accepting fuel deliveries. Like the instant case, Metro's driver never told anyone that he was delivering dyed diesel fuel and ConEd's fuel tanks were constructed in such a way that the fuel, especially the color, could not be seen from the outside. After receiving the delivery, ConEd's employee "briefly scanned" the delivery ticket to insure that it accurately reflected the amount of fuel received. ConEd's employee then signed the delivery ticket, "apparently without noticing the 'RED-DYED' stamp." *Consolidated Edison*, 34 F.Supp.2d at 163. Metro's driver then gave ConEd a yellow carbon copy of the delivery ticket which *did not* contain the "RED-DYED" stamp.

Later that day, Metro's dispatcher received the delivery ticket and quickly realized that ConEd had received the wrong fuel. The dispatcher immediately called a tank cleaning service and told ConEd's fuel station employee to "close the pumps down." Immediately thereafter, ConEd did in fact close the pumps down and "cordoned them off with bright yellow tape." *Id.*

Although it took immediate action to rectify the problem, ConEd's fate soon took a turn for the worse as on the very day of this ill-fated delivery, an IRS Dyed Diesel Compliance Officer (coincidentally, the same Carl Suarez as in the instant action) arrived at Metro's facility to conduct a routine fuel inspection. Unfortunately for ConEd, Suarez quickly learned of the mistaken delivery and immediately ordered the tank cleaning service to refrain from cleaning the tank until he arrived at the scene. Upon arrival, Suarez tested the fuel and found, to no one's surprise, the presence of dyed diesel fuel in ConEd's storage tank and in 11 of its trucks. Despite Metro and ConEd's immediate action to rectify the problem, Suarez imposed a $31,000 penalty: "$20,000 for holding dyed diesel fuel in the storage tank and $1,000 for each of the 11 vehicles that had refueled with dyed diesel." *Id.* at 164.

The central issue in *Consolidated Edison* was whether ConEd knew or had reason to know that the fuel was dyed. The Court ultimately found that ConEd did know or have reason to know that the fuel was dyed, basing its decision solely on the presence of the bright red 18-point "RED DYED" stamp found on the delivery ticket. The Court explained that

ConEd's principal argument is that it should not be punished for a delivery mix-up that it neither intended nor caused. On its face, this is a compelling argument. Common sense dictates that a taxpayer in ConEd's position should be allowed to return the dyed diesel fuel, or to pay taxes on it, without being made to pay an additional penalty. However, ConEd's liability is not governed by common sense; it is governed by the Internal Revenue Code,

under the terms of which ConEd was properly penalized. . . .

This finding derives from the undisputed fact that the delivery ticket presented by [Metro's driver] was stamped "RED DYED" in bright red 18-point letters. Although the ticket contained other information that might indicate a delivery of clear diesel, the "RED DYED" stamp is the biggest, most visible piece of information on the ticket. Thus, it is irrelevant that the color of the fuel was not visible during the pumping process or that Russell did not tell the College Point attendants that he was delivering dyed diesel. The conspicuous "RED DYED" stamp was sufficient by itself to alert ConEd's employees to the presence of dyed diesel.

*Id.* at 165. As the "RED DYED" stamp gave ConEd constructive notice that dyed diesel fuel was delivered, the Court found that imposition of the penalty was appropriate.

Upon first review, it appears that the facts of *Consolidated Edison* are analogous to the Debtor's predicament. Upon closer scrutiny, however, the factual differences in the two cases are significant and, as a consequence, warrant different results. Unlike *Consolidated Edison*, this is not a situation where the Debtor only uses diesel fuel. Rather, here, the Debtor uses both types of fuel: diesel fuel for its trucks and heating fuel for its boilers. Thus, the mere presence of a stamp on a delivery ticket would not, and could not, by itself alert this Debtor to the fact that heating fuel had been delivered erroneously into its tanks and that it was therefore using heating fuel for an improper purpose.

Nevertheless, even if such a stamp on the delivery tickets could have placed the Debtor on notice that it was using dyed diesel fuel for an improper purpose, the delivery tickets here bare no resemblance to the delivery ticket at issue in *Consolidated Edison*. Most notably, there is the complete absence of any prominent notation which would tend to alert

the person receiving the fuel that heating fuel had been delivered.

The Montebello delivery tickets admitted into evidence are, to say the least, not consistent and, to say the worst, misleading. Some diesel fuel tickets contain a prominent "clear" diesel fuel notice; some do not. Some diesel fuel tickets contain a "clear" diesel fuel notice *and* a boilerplate heating fuel notice. One *diesel* fuel ticket contains only a *heating* fuel notice. Although the three heating fuel delivery tickets do contain a heating fuel notice, it is by no means conspicuous; indeed, it appears to be printed in 7-point letters—which are smaller than the print in this decision by 5-fold. Moreover, two of the three notices were rendered virtually indecipherable by Montebello's collection warning.

Nor is this a case where a reasonably prudent person in Debtor's situation would have been able to easily review these delivery tickets and determine the differences in the two fuels and which were delivered to which tanks. Taken as a whole, Montebello's delivery tickets do not have any distinguishing features which would give the Debtor constructive notice of the different uses for the fuels and possible penalties for improper use. Nor do they give any advice as to whether the fuel was correctly delivered to the proper tank.

Additionally, although not expressly mentioned in *Consolidated Edison*, it is readily apparent that ConEd knew and was keenly sensitive to the difference between "clear" diesel fuel and "dyed" diesel fuel and the consequences for improper use.[14] Here, although the Debtor knew that there were two types of fuel (namely, diesel fuel and heating fuel), it did not know or appreciate the difference between these two fuels and/or the tax consequences. Marini and Disonda both testified that they did not know the difference between the two types of fuel prior to Suarez' inspection. Locasio testified that he did not know there were different types of fuel. The Court finds their testimony to be credible and to be consistent with the actions

14. "Because the vehicles that refueled at the College Point station were used for highway purposes, that station received only clear diesel fuel.

As a result, ConEd never instructed its station attendants there about the existence of dyed die-

taken by the company both before and after the incident.

Among other things, the Court finds that the remedial action taken by the Debtor, upon the direction of Locasio, to ensure that there would be no future confusion in the delivery of the fuel supports the Debtor's arguments that it did not knowingly and intentionally use dyed fuel for an improper purpose. More specifically, after the two visits by the agents, the dyed fuel fill tube was painted red, the area around the two pumps were fenced in, a second barrel for "drip" was added, and a sign was posted which states: "Off highway fuel for machine only. Dyed diesel fuel, not for trucks, 2/26/96." Trial Tr. (March 6) at 25–27; Trial Exhs. 33–36. Even Suarez, the IRS' own witness, conceded that these remedial measures were in place when he re-inspected the site and that they were appropriate.

The only evidence presented at the hearing concerning Debtor's knowledge of the different uses for the two fuels was Suarez' testimony about his conversation with Locasio on February 23, 1996. As noted, Suarez recalled Locasio saying that he knew about the different types of fuel; Locasio did not. However, the Court finds Locasio's explanation concerning this conversation to be both reasonable and plausible. Specifically, Locasio believed that he did not fully understand the difference between the fuels until the visit of the EPA agent on February 26th and his written statement of that date is consistent with this testimony. *See* Trial Exh. 31 (the statement states that Locasio "did not know that there were different types of fuel" and that he "was not aware that the trucks were using the wrong type of fuel"). In addition, the circumstances surrounding the events of February 23rd and February 26th support the testimony given by Locasio, including the facts that (i) Montebello had not previously delivered fuel to FM, (ii) Wolinski might have delivered fuel to the wrong tanks, (iii) there was no way that FM could readily have detected the error, (iv) the delivery tickets did not contain reliable information, and (v) FM promptly undertook remedial actions to ensure future compliance.

For all these reasons, based on a review of the trial exhibits, the testimony adduced at the hearing and the arguments of the parties, the Court finds that the Debtor did not know, or have reason to know, that it had received and was using dyed diesel fuel for an improper purpose. Accordingly, that portion of the IRS claim seeking to impose a $45,000 penalty is expunged in its entirety.[15]

### CONCLUSIONS OF LAW

1. The Court has jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(B), and venue is proper. This is a core proceeding arising under Title 11 of the United States Code.

2. The Debtor's motion to expunge or reduce that portion of the Internal Revenue Services' claim founded upon the imposition of a $45,000 penalty for the improper use of dyed diesel fuel for a taxable purpose is hereby granted to the extent that claim number 43 in the amount of $58,362.50, filed by the Internal Revenue Service on April 9, 1997, is hereby reduced to 13,362.50. That part of the IRS claim that seeks the $45,000 penalty is hereby expunged in its entirety.

The Debtor is directed to settle an Order consistent with this Decision.

---

sel or its tax consequences." *Consolidated Edison,* 34 F.Supp.2d at 162.

**15.** As that portion of the IRS claim relating to the $45,000 penalty is expunged, the Court need not reach the Debtor's alternative argument concerning the amount of the penalty.