**RETROFIT PARTNERS I, L.P. and Advanced Executive Aircraft, Inc., Plaintiffs–Appellants,**

v.

**LUCAS INDUSTRIES, INC., Defendant–Appellee.**

**Docket No. 99–7517.**

United States Court of Appeals, Second Circuit.

Argued Oct. 28, 1999.

Decided Jan. 5, 2000.

William M. Bloss, Jacobs, Grudberg, Belt & Dow, P.C. (David L. Belt, of counsel), New Haven, CT, for Plaintiffs–Appellants.

Rodney M. Zerbe, Dechert Price & Rhoads (Robert A. Cohen, of counsel), New York, NY, for Defendant–Appellee.

Before: FEINBERG, CARDAMONE, and SACK, Circuit Judges.

SACK, Circuit Judge:

This is an appeal from a judgment of the United States District Court for the District of Connecticut (Gerard L. Goettel, *Judge*) granting the defendant's motion for summary judgment. *See Retrofit Partners I, L.P. v. Lucas Indus., Inc.*, 47 F.Supp.2d 256 (D.Conn.1999).

The plaintiffs and the defendant entered into a written agreement pursuant to which the plaintiffs would give the defendant information that it could use in considering whether to invest or otherwise participate in a business project proposed by the plaintiffs. In granting the defendant's motion for summary judgment made after the completion of substantial discovery, the district court concluded that there was no material triable issue of fact as to the plaintiffs' claim that the defendant's failure to decide in a timely fashion whether or not to make such an investment constituted a breach of contract. Because the district court found that the defendant was not obligated to make an investment decision, the court further concluded that there was no breach of the covenant of good faith and fair dealing implied under applicable Connecticut law. The district court also rejected a misrepresentation claim made by the plaintiffs because it found that the plaintiffs could not prove that they had reasonably relied on any misrepresentations to their detriment. Finally, the district court held that the plaintiffs' claim under the Connecticut Unfair Trade Practices Act ("CUTPA") failed because that claim simply incorporated the previous allegations on which summary judgment for the defendant was to be granted. The district court therefore granted the defendant's motion for summary judgment on all of the plaintiffs' claims. The plaintiffs appealed.

We affirm, writing at some length because our grounds for doing so are somewhat different from those relied upon by the district court.

## BACKGROUND

Plaintiff Advanced Executive Aircraft, Inc., ("AEA") is a Delaware corporation whose sole shareholder is Thomas M. Donegan. Plaintiff Retrofit Partners I, L.P., ("Retrofit") is a Delaware limited partnership in which AEA is the sole general partner and Donegan is the sole limited partner. Defendant Lucas Industries, Inc., ("Lucas Industries") is a Michigan corporation with its principal place of business now in New York, but in Virginia for the period at issue here. Lucas Aerospace, Inc., ("Lucas Aerospace") was a Michigan corporation with its principal place of business in California. It was a wholly owned subsidiary of Lucas Industries until December 31, 1993 when it merged into Lucas Industries. Lucas Aviation, Inc., ("Lucas Aviation") was in turn a wholly owned subsidiary of Lucas Aerospace. (The three entities are collectively referred to as "Lucas.")

From 1966 until 1983, Dassault Aviation, SA, a French corporation, manufactured the Falcon 20, a corporate jet. The Falcon 20 was equipped with two General Electric engines but apparently, as so equipped, was underpowered. In 1986 a company named Garrett Airline Services joined with Dassault to re-equip the Falcon 20 with engines manufactured by Garrett. Completion of the retrofitting of Falcon 20 aircraft under this project began in June 1989. At about the same time, a company named Volpar, Inc., announced its own program to retrofit the Falcon 20 with two Pratt & Whitney Canada ("P & WC") 305 engines. Donegan was a consultant on Volpar's program at the time.

After Donegan's relationship with the Volpar program ended in 1989, he embarked on his own project for re-engining the Falcon 20. His plan, which he coined the "Vantage 305 program," like Volpar's, called for the replacement of the Falcon 20's engines with P & WC 305 engines.

Although Donegan personally retained proprietary rights to his Vantage 305 program, he sought to develop this perceived business opportunity through his corporation, AEA, and his partnership, Retrofit.

In order to proceed with their program to retrofit Falcon 20 aircraft, the plaintiffs were required to obtain certification from the Federal Aviation Administration. Donegan therefore enlisted a company named Aerotest, Inc., to perform the required engineering work. Meanwhile, Donegan hired Kidder, Peabody & Company ("Kidder"), an investment banking firm, to raise $12 million in capital for the venture. In pursuit of this endeavor, Kidder prepared an offering memorandum for Retrofit.

In late 1991, dissatisfied with the results of Kidder's efforts, Donegan tried to attract investors himself. He was largely unsuccessful. Because Donegan failed to raise sufficient funds, the plaintiffs never made any payment to Aerotest and Aerotest never performed any of the agreed upon work for the plaintiffs.

Then, in August or September 1992, the plaintiffs approached Lucas Aerospace to see whether it would be interested in providing engineering services to or making an investment in the plaintiffs' project. In connection with those discussions, on September 4, 1992, Lucas Aerospace and Retrofit entered into what was termed a "Confidentiality and Non–Circumvention Agreement" (the "1992 Agreement"). It provided that the plaintiffs would make available to Lucas the offering memorandum prepared by Kidder and other information proprietary to the plaintiffs bearing on the Vantage 305 program in order to enable Lucas to evaluate the possibility of providing the engineering services for or making a monetary investment in the program.

The 1992 Agreement, drafted by Donegan without the assistance of legal counsel and signed by a Lucas Aerospace representative in the form presented to him, provided in part that AEA, Retrofit,

and their financial advisers ... will provide proprietary information including an Offering Memorandum prepared by Kidder, to Lucas Aerospace, in connection with the consideration of a possible investment by it in Retrofit Partners.... The materials and information ... will be provided to you exclusively for the purpose of evaluating your investment interest in Retrofit Partners and to consider providing engineering and other technical services relating to our Vantage 305 re-engining program for the Falcon 20 aircraft.

The document recited confidentiality and non-circumvention requirements with respect to those "materials and information." It concluded:

You [Lucas Aerospace] hereby recognize and agree that "time is of the essence" and any delay caused by you may result in fatal harm to Retrofit Partners. You hereby agree that you will be responsible for all damages caused by any such delay, and will indemnify Retrofit for all such damages ... caused by your actions, or the lack thereof....

While Lucas was evaluating the project, Donegan approached yet another entity called Dalfort Aviation about the possibility that it would purchase or lead the Vantage 305 program. According to Donegan, Dalfort expressed interest but lacked the necessary engineering capability and therefore wanted to secure the involvement of Lucas, which had sufficient expertise. A meeting among Donegan and representatives of Lucas, Dalfort and P & WC was held at Lucas's Santa Barbara, California facility in October 1992. Following the meeting, Lucas Aviation submitted a proposal to Dalfort detailing the engineering services it could provide if Dalfort purchased the plaintiffs' program. Donegan testified that he considered this proposal to be satisfactory.

Dalfort's purchase of the Vantage 305 program was never consummated. P & WC, whose engines were to be installed on the aircraft under the program, refused to

do business with Dalfort because of pending litigation between a Dalfort shareholder and a P & WC Connecticut affiliate. There is no claim that Lucas was in any way responsible for the failure of the Dalfort deal.

Despite the disappearance of Dalfort, Lucas remained interested in the project. The plaintiffs and Lucas both anticipated that Lucas would analyze the feasibility of taking over Dalfort's role in the aborted deal. In the following months, the parties met on many occasions to discuss various issues relating to the project.

On July 19, 1993, representatives of Lucas and P & WC met without Donegan to discuss the program's marketability. The two agreed to conduct further investigations into the feasibility of the project and to share their costs in doing so.

Nine days later, Donegan, on behalf of AEA, and William Ashworth, on behalf of Lucas Aviation, signed a "Consultant Agreement" under which AEA was to be paid a monthly fee for providing advice while Lucas Aviation continued to consider whether to invest or otherwise become involved in the Vantage 305 program. Lucas Aviation paid AEA under the Consultant Agreement until it was terminated in accordance with its terms in March 1994.

Meanwhile, on February 22, 1994, after yet more meetings between Lucas and P & WC, Lucas wrote to Donegan informing him that Lucas and P & WC had decided not to proceed with the project because "at the end of the day the deal simply did not make economic sense." The plaintiffs responded by filing this lawsuit in Connecticut Superior Court on July 29, 1996. The defendant removed the action to the United States District Court for the District of Connecticut.

The plaintiffs' complaint alleged various breaches of the 1992 Agreement by the defendant. Count One claimed that the defendant breached the 1992 Agreement by "not act[ing] in a timely manner to determine whether it would invest or participate in the Vantage 305 program," and sought liquidated damages. Count Two restated the breach alleged in Count One and claimed that the defendant had further breached the agreement because Lucas had violated the non-disclosure and non-circumvention portion of the 1992 Agreement. The plaintiffs demanded lost profits for the breaches. Count Three alleged that Lucas's actions also breached the 1992 Agreement's implied covenant of good faith and fair dealing. Count Four asserted that "Lucas repeatedly, intentionally or recklessly misrepresented to plaintiffs its actual intentions with respect to the Vantage 305 program" and that Lucas did so in order to initiate and solidify a relationship between itself and P & WC to the exclusion of the plaintiffs. The fifth and final count of the complaint contended that Lucas violated CUTPA by taking "actions with respect to [the plaintiffs that] constituted unfair or deceptive acts or practices in its trade or commerce." The district court subsequently granted the defendant's motion for summary judgment as to all claims. The plaintiffs appealed.

## DISCUSSION

### I.   Standard of Review

■   We review the district court's decision to grant the defendant's motion for summary judgment *de novo*, determining whether there is any genuine issue as to a material fact and whether the moving party is entitled to judgment as a matter of law. *See Sharkey v. Ultramar Energy Ltd.*, 70 F.3d 226, 228–29 (2d Cir.1995). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### II.   Breach of Contract

■   The plaintiffs first argue that the district court improperly granted summary judgment to the defendant on its breach of

contract claim. The plaintiffs contend that under the terms of the 1992 Agreement the defendant was obligated to communicate a final investment decision to them promptly. Alternatively, the plaintiffs argue that the terms of the contract are ambiguous and a jury must therefore be permitted to decide whether the agreement embodies such a term.

The district court concluded that no binding agreement arose between the parties and that the 1992 Agreement only constituted an invitation by the plaintiffs for Lucas to make an offer. *See Retrofit Partners,* 47 F.Supp.2d at 263. To the contrary, we think it clear that the 1992 Agreement was a binding contract. It was a written instrument executed by both parties pursuant to which the plaintiffs divulged proprietary information and the defendant agreed to refrain from sharing that information with others and from competing with the plaintiffs' project. The question before us is therefore whether that contract contained the promise by the defendant upon which the plaintiffs bring suit, i.e., the promise to decide promptly whether to invest in Retrofit or the Vantage 305 program.

The Connecticut Supreme Court has held that

in situations in which the parties have their agreement in writing, their intention is to be determined from its language and not on the basis of any intention either may have secretly entertained. Where there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law.

*Thompson & Peck, Inc. v. Harbor Marine Contracting Corp.,* 203 Conn. 123, 130–31, 523 A.2d 1266, 1270 (1987) (internal quotation marks and citation omitted). It was therefore necessary for the district court in deciding the summary judgment motion, as it is now necessary for this Court in conducting *de novo* review, first to look to the language of the 1992 Agreement.

The plaintiffs argue that Lucas's obligation to make and communicate promptly a final investment decision is implied by two clauses of the 1992 Agreement read together: the first, which states that the plaintiffs' proprietary information was being given to Lucas to enable it to "evaluat[e] [its] investment interest in Retrofit Partners and to consider providing engineering and other technical services relating to [the] Vantage 305 re-engining program for the Falcon 20 aircraft," and the second, that "time is of the essence." They urge that either the district court should have found that the "time is of the essence" clause obligated the defendant to make a decision as to its "investment interest" promptly, or at least that there was an ambiguity in the contract's language as to whether the 1992 Agreement imposed such an obligation and that the ambiguity rendered summary judgment improper. We disagree.

■ A "time is of the essence" clause in a contract does not in itself ordinarily impose an independent time constraint on one or both of the parties to the contract. Its commonly understood meaning is that insofar as a time for performance is specified in the contract, failure to comply with the time requirement will be considered to be a material breach of the agreement. *See Mazzotta v. Bornstein,* 104 Conn. 430, 437, 133 A. 677, 680 (1926); *see also Drinkwater v. Patten Realty Corp.,* 563 A.2d 772, 776 (Me.1989); 3A Arthur Linton Corbin, *Corbin on Contracts* § 713 (1963); 6 Walter H.E. Jaeger, *Williston on Contracts,* § 846, at 181 (3d ed. 1962) ("When it is said that time is of the essence, the proper meaning of the phrase is that the performance by one party at the time specified in the contract or within the period specified in the contract is essential in order to enable him to require performance from the other party."). The 1992 Agreement anticipated that Lucas would "consider[ ]" an investment in Retrofit, but it neither set a deadline for Lucas to complete such an "evaluat[ion]" nor required

that Lucas decide whether or not to make the investment. The "time is of the essence" clause therefore did not create an obligation on the defendant's part to make or communicate any investment decision, let alone one to do so in accordance with any particular time schedule. Indeed, the 1992 Agreement was specific only regarding Lucas's confidentiality and non-circumvention obligations to the plaintiffs. It did not set forth any specifics at all regarding the investment or engineering obligations that Lucas would undertake should it decide to go forward with the Vantage 305 business venture. Therefore, a jury could not reasonably construe the "time is of the essence" clause to obligate Lucas to decide whether to invest in a project that had not yet been defined.

▆▆▆ The plaintiffs seek to rely on extrinsic evidence to support their reading of the 1992 Agreement. Specifically, they point to the deposition testimony of Charles Corradi, Vice President for Business Development of Lucas Aerospace, who signed the 1992 Agreement on its behalf, to the effect that he believed the 1992 Agreement "put us on the clock" and required Lucas to "take extra caution on being timely about doing a study that proved whether this was a viable opportunity or not." But only if there was ambiguity in the 1992 Agreement would we be permitted to take this extrinsic evidence into account in determining whether the "time is of the essence" clause required a prompt investment decision by Lucas. *See, e.g., Levine v. Advest, Inc.,* 244 Conn. 732, 745–46, 714 A.2d 649, 656–57 (1998). The text of the 1992 Agreement, labeled a "Confidentiality and Non–Circumvention Agreement," is not ambiguous. It clearly did not obligate Lucas to do anything more than protect the confidentiality of the plaintiffs' disclosures and not to compete with the plaintiffs' project. "The circum-

stances surrounding the making of the contract, the purposes which the parties sought to accomplish and their motives cannot prove an intent contrary to the plain meaning of the language used." *Levine v. Massey,* 232 Conn. 272, 279, 654 A.2d 737, 741 (1995); *cf. Consarc Corp. v. Marine Midland Bank, N.A.,* 996 F.2d 568, 573 (2d Cir.1993) (applying New York law, and noting that "extrinsic evidence may not be used to create an ambiguity in an otherwise unambiguous agreement"). The evidence of what Corradi *thought* the agreement meant is therefore irrelevant.

If, as the plaintiffs urge, the "time is of the essence" clause were rendered meaningless absent the obligation that the plaintiffs seek to imply, we might be more receptive to their argument that the contract is ambiguous and that reference to extrinsic evidence is therefore warranted. Under the 1992 Agreement, however, the defendant was required to provide "prompt notice" to Retrofit in the event it became legally obligated to divulge any confidential information it had received from the plaintiffs. The "time is of the essence" clause applied at least to this "prompt notice" provision. *Cf. Hatcho Corp. v. Della Pietra,* 195 Conn. 18, 23, 485 A.2d 1285, 1289 (1985) ("Parties generally do not insert meaningless provisions in their agreements and therefore every provision must be given effect if reasonably possible."). Extrinsic evidence thus is not necessary to give the clause meaning.[1]

### III. Obligation of Good Faith and Fair Dealing

▆▆▆ Under Connecticut law, "[e]very contract carries an implied covenant of good faith and fair dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." *Habetz v. Condon,* 224 Conn. 231, 238, 618 A.2d 501, 505

---

1. The plaintiffs also alleged breach of the confidentiality and non-circumvention portions of the 1992 Agreement. The district court granted summary judgment for the defendant on those claims as well. Plaintiffs do not challenge that portion of the district court's decision on appeal.

(1992). The plaintiffs claim that Lucas breached the covenant implied in the 1992 Agreement. The 1992 Agreement contained no term, however, requiring Lucas to decide whether to invest in Retrofit or the Vantage 305 program by any particular time or at all. Nothing the defendant did, therefore, could have injured the plaintiffs' right to receive a nonexistent benefit of the 1992 Agreement.

The plaintiffs argue that even if Lucas was not required to respond in a timely fashion, it still had an obligation to exercise its discretion in good faith and failed to do so. For this, the plaintiffs rely on *Saturn Construction Co. v. Premier Roofing Co.*, 238 Conn. 293, 305, 680 A.2d 1274, 1281 (1996) (where parties to contract confer discretion to arbitrator, principles of good faith and fair dealing require that arbitrator's discretion "must be exercised for purposes reasonably within the contemplation of the contracting parties" (internal quotation marks omitted)), *Warner v. Konover*, 210 Conn. 150, 152, 156, 553 A.2d 1138, 1139, 1141 (1989) (where lease prohibited tenant from assigning the leasehold "without the prior written consent of Landlord," consent could only be withheld in good faith), and *Central New Haven Development Corp. v. La Crepe, Inc.*, 177 Conn. 212, 216–17, 413 A.2d 840, 842–43 (1979) (where tenant is given right to cancel lease after a certain time period, the decision to exercise that right must be made in good faith). But these cases hold only that if an agreement compels a decision that will affect the rights of the parties, such a decision must be made in good faith. The 1992 Agreement did not compel Lucas to make any choice at all about investing in Retrofit or the Vantage 305 project; since no choice was compelled, there was no further requirement that it be made in good faith.

**2.** *See, e.g., Meyers v. Cornwell Quality Tools, Inc.*, 41 Conn.App. 19, 28–29, 674 A.2d 444, 450 (App.Ct.1996) ("The requirement that a representation be made as a statement of fact focuses on whether, under the circumstances

### IV.  Misrepresentation

■ The plaintiffs next argue that the district court erred in dismissing their misrepresentation claim. To make out a claim of fraudulent or negligent misrepresentation a plaintiff must show, *inter alia,* that there was a false statement of fact by the defendant and justifiable reliance on the statement by the plaintiff to its detriment. *See Citino v. Redevelopment Agency of City of Hartford,* 51 Conn.App. 262, 273–76, 721 A.2d 1197, 1206–07 (App.Ct.1998). The two statements that plaintiffs assert were misrepresentations in the case at bar are (a) a Lucas representative's alleged statement at a May 1993 meeting "assur[ing] Donegan that [Lucas] was serious about exploring the possibility of acquiring the program for Lucas Aviation," and (b) a statement purportedly made at the same meeting by a Lucas employee that "Lucas would acquire the Vantage 305 Program on terms already discussed[ ] [and] that Lucas would execute a consulting agreement with AEA Inc. for the expected short transition period."

■ As to the first statement, assuming it to be an assertion of fact sufficient to support a claim of misrepresentation,[2] there is no evidence that the statement was false—that Lucas was not "serious" about the possibility of making an investment. Without falsity there could have been no actionable misrepresentation.

■ As to the second statement, the plaintiffs could not have justifiably relied on it to their detriment. It was followed but two months later by the execution of the Consultant Agreement which provided that the agreement "w[ould] terminate upon any decision by Lucas not to proceed with the program and no other obligations w[ould] exist." The district court correctly found, *see Retrofit Partners,* 47 F.Supp.2d

surrounding the statement, the representation was intended as one of fact as distinguished from one of opinion." (internal quotation marks and citation omitted)).

at 271, that this language made clear to the plaintiffs that the defendant did not consider itself bound to enter into an agreement with the plaintiffs and that the plaintiffs' reliance on any prior oral statements by Lucas to the contrary would therefore not have been reasonable or justified.[3]

The plaintiffs argue that summary judgment on this basis was inappropriate for two reasons. First, they note that only one of the plaintiffs, AEA, was a party to the Consultant Agreement. But that is entirely beside the point. Irrespective of who was bound by the contract, there is no doubt that both of the plaintiffs were fully aware of the contents of the Consultant Agreement, which Donegan signed as president of AEA, including the statement making clear that Lucas thought itself free to decide thereafter not to go forward with an investment in the project. The plaintiffs could not, in light of that statement, have been misled by Lucas into thinking otherwise.

The plaintiffs also claim that because the party to the Consultant Agreement was Lucas Aviation the contract has no relevance to the intentions of the defendant, a separate entity. That argument fails similarly. A contract entered into by one Lucas entity may not, of course, bind all the Lucas entities. But a statement by any one of the Lucas entities, in a contract or anywhere else, that made clear that Lucas was contemplating a decision not to participate in the Vantage 305 Program was as plain a statement of the intent of the Lucas entities as it would have been had all three made the statement in unison. Once one of those corporations referred to a possible future "decision by Lucas not to proceed with the program," the plaintiffs were fully informed that the defendant did not consider itself bound to "acquire the Vantage 305 Program on terms already discussed."

---

3. It is theoretically possible that during the two months between the time of the alleged statement at the May meeting and the statement in the July Consultant Agreement that

## V. CUTPA

Finally, the plaintiffs claim that the district court incorrectly granted the defendant summary judgment on their CUTPA claim. CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen.Stat. § 42–110b(a)(1995). Having found that there was no breach of contract, no breach of the implied covenant of good faith and fair dealing, and no reasonable reliance by the plaintiffs on any alleged oral misstatements by the defendant, there is no basis for a claim under CUTPA. In this case, there is simply no material, triable issue from which a reasonable juror could have concluded that the defendant engaged in any unfair or deceptive business practice. The district court's grant of summary judgment for the defendant on this point was therefore also correct.

## CONCLUSION

For these reasons, the district court's judgment is affirmed.

the plaintiffs misunderstood the intentions of the defendant, but plaintiffs do not claim that their injury arose from being misled for this discrete period of time.