CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., Plaintiff–Appellant,

v.

UNITED STATES of America, Defendant–Appellee.

No. 1350, Docket 99–6186.

United States Court of Appeals, Second Circuit.

Argued March 24, 2000

Decided July 25, 2000

---

Frank Agostino, Hackensack, N.J. (Calo Agostino, P.C., on the brief), for Plaintiff–Appellant.

Sean C. Cenawood, Assistant United States Attorney, New York, N.Y. (Mary Jo White, United States Attorney for the Southern District of New York, Jeffrey

Oestericher, Assistant United States Attorney, on the brief), for Defendant–Appellee.

Before: FEINBERG, JACOBS, and STRAUB, Circuit Judges.

Judge STRAUB dissents in a separate opinion.

JACOBS, Circuit Judge:

Under the Internal Revenue Code ("I.R.C."), certain chemically similar fuels are taxed when used for highway use, but untaxed when used for heating. To facilitate this disparate taxation of interchangeable substances, the I.R.C. provides that untaxed fuel be dyed red and provides for imposition of penalties when "any dyed fuel is held for use or used by any person for a use other than a nontaxable use and such person knew, or had reason to know, that such fuel was so dyed." 26 U.S.C. (I.R.C.) § 6715(a)(2). Red-dyed (untaxed) diesel fuel was accidentally delivered to Consolidated Edison Company of New York, Inc. ("ConEd") for use in its trucks, a taxable use, and the Internal Revenue Service ("IRS") assessed a $31,000 penalty on the basis that ConEd had reason to know that the fuel was dyed. ConEd filed this action to review the imposition of the penalty, and now appeals from the judgment of the United States District Court for the Southern District of New York (Mukasey, J.) granting summary judgment in favor of defendant United States and dismissing ConEd's complaint.

On appeal, ConEd argues that (i) as a matter of law, it lacked "reason to know" that it possessed dyed fuel; (ii) summary judgment was granted despite the existence of disputed issues of material fact as to whether it had reason to know; and (iii) even if some penalty was properly imposed against ConEd, the IRS incorrectly calculated it.

We reject ConEd's contention that it lacked reason to know as a matter of law, but we agree that a disputed issue of material fact exists as to that issue, and remand for further proceedings. We do not reach the calculation of the penalty.

## BACKGROUND

The facts on this appeal are largely undisputed.

### A. *Taxation of diesel fuel*

Because taxed diesel fuel for (*inter alia*) highway use and untaxed diesel fuel for (*inter alia*) heating have largely similar chemical compositions and can be employed interchangeably, federal law mandates that the untaxed fuel be identifiable by the addition of red dye. *See* I.R.C. § 4082(a). Nontaxable fuel is commonly called "red-dyed fuel," while taxable fuel is called "clear fuel" or "low sulphur diesel fuel."

Since January 1, 1994, it has been illegal to be in possession of red-dyed fuel for taxable purposes. The relevant statute provides:

(a) **Imposition of penalty.**—If—

. . . . .

(2) any dyed fuel is held for use or used by any person for a use other than a nontaxable use and such person knew, or had reason to know, that such fuel was so dyed,

. . . . .

then such person shall pay a penalty in addition to the tax (if any).

I.R.C. § 6715. The penalty for such possession or use is determined as follows:

(b) **Amount of penalty.**—

(1) **In general.**—. . . [T]he amount of the penalty under subsection (a) on each act shall be the greater of—

(A) $1,000, or

(B) $10 for each gallon of the dyed fuel involved.

*Id.*

### B. *Facts*

ConEd owns, operates, and leases highway vehicles that use clear—*i.e.*, taxable—fuel. To service those vehicles, ConEd maintains fueling stations, one of which is in College Point, Queens, New York (the

"College Point fueling station" or "College Point").

ConEd contracted with Metro Fuel Oil Corporation ("Metro") for deliveries of clear fuel beginning January 1, 1997. The contract provided that ConEd would pay the federal excise tax levied on clear fuel. ConEd's first Metro order, placed on January 23, 1997, was for 2,000 gallons of clear fuel to be delivered to the College Point fueling station.

ConEd's order was recorded on a delivery ticket generated by Metro. That delivery ticket, which is potentially crucial, is approximately three inches by nine inches and consists of a white top leaf, a yellow middle leaf, and a white bottom leaf. The second and third leaves record what is written on the top leaf by a standard pressure-dependent duplication process. The top leaf is multicolored, with black entries mechanically printed on the red and blue preprinted form. The ticket contains warnings, front and back, that dyed diesel fuel (*inter alia*) is for nontaxable use only and that penalties apply for taxable use.

On the ticket generated by the ConEd order, the box labeled "PRODUCT" contains the typed entry "L.S.DIESEL," *i.e.,* low-sulphur diesel, which is another name for clear, taxed diesel fuel. It is undisputed that the phrase "L.S.DIESEL" was highlighted in red by someone at Metro. (This phrase and one other, irrelevant to this case, are the only things highlighted on the ticket.) On the same ticket, the box labeled "TAXES" contains the typed figures "8.25%/46.85," indicating (i) the rate at which the fuel was taxed (8.25%) and (ii) the amount of the tax ($46.85). The obvious import of the entries in the "TAXES" box is that the fuel delivered was subject to federal excise tax. The ticket is reproduced as an appendix to the dissent; but unless the reader can view the ticket in color, the appendix obscures a key entry. On the face of the ticket (as is clear in color), the entry "L.S.DIESEL" appears in the right column, highlighted in bright pink. But in black-and-white, the entry is obliterated by the highlighter ink and appears as a dark blob.

By some accident of Metro's, ConEd's ticket was included among the orders for red-dyed fuel and stamped "RED DYED" in red print larger than any other words on the ticket. Metro's "RED DYED" stamp did not, however, exert sufficient pressure on the top leaf to be reflected on subsequent leaves of the ticket.

On Friday, January 24, 1997, Metro driver James Russell drove a truck full of red-dyed fuel to the College Point fueling station, the ticket stamped "RED DYED" in his possession. He arrived there around 7 a.m., stated that he was delivering the first order under the new contract, and inquired as to the proper delivery procedures. Russell claims that he then spoke with the supervisor of the College Point fueling station, Robert Beers, and showed him the ticket; Beers denies having spoken to Russell prior to the delivery.

It is undisputed, however, that Russell was told about College Point's delivery procedures by Leonard Bertucco, another ConEd employee, and pumped the 2,000 gallons of red-dyed fuel into the fueling station's tank. Russell then presented the delivery ticket, stamped "RED DYED," to Bertucco for signature. Bertucco signed the ticket after a brief inspection in which, he claims, he checked only the entry for quantity and did not notice the "RED DYED" stamp, which was elsewhere on the page. Russell then detached the yellow middle leaf of the ticket—which did not bear the imprint of the "RED DYED" stamp—and gave it to Bertucco.

By error, Metro had delivered red-dyed fuel, which was placed in the station's single, opaque holding tank for low-sulphur fuel. The coloration of the fuel in the tank could not be ascertained by looking at the tank or by observing the attached pumps or hoses. The station had not previously received delivery of any red-dyed fuel.

The IRS does not contend that Bertucco or any other ConEd employee had actual

knowledge, at the time of delivery, that the fuel in the tank was red-dyed; nor does the IRS claim that Bertucco or any other ConEd employee who had access to the ticket had reason to know the significance of red dye in diesel fuel. Bertucco did not ask Russell what type of fuel was being delivered, and Russell did not say. The only sign to any ConEd employee that the fuel was dyed was the stamp on the ticket checked by Bertucco.

Upon completing his rounds, Russell returned the top leaf of the delivery tickets to Metro's office, where Metro's operations manager, Joseph Ricciardella, inspected the day's tickets and discovered the error. He immediately retained ABC Tank Cleaning ("ABC") to go to College Point and pump out the misdelivered fuel. He also advised an unknown ConEd employee at the fueling station that a mistake had been made and instructed that the pumps that were delivering dyed fuel should be shut down. ConEd promptly shut down the affected pumps.

Also that day, the Metro tickets were inspected by a person with the title "IRS Dyed Diesel Fuel Compliance Officer," who asked about the delivery of dyed fuel to ConEd and was apprised of the mistake and of the prompt and ongoing efforts to remedy that mistake. Having thus learned that an innocent mistake, committed without tax avoidance or evasion, without concealment, and without harm, was about to be corrected voluntarily, immediately and without consequence, officer Carl Suares sprang into action: he directed that ABC's cleaning of the tank be halted, hastened to College Point, took a sample from the holding tank, and instructed that the station's trucks be immobilized until he could return three days later to sample their tanks.

On Saturday, January 25, 1997, the day after the delivery, ABC cleaned the College Point holding tank. On Monday, January 27, after the weekend-long impoundment of ConEd's College Point fleet, Suares returned and sampled the tanks of the trucks. He concluded that the holding tank and the tanks of eleven trucks contained red-dyed fuel, and prepared an assessment request demanding payment of a penalty totaling $31,000: $20,000 for the 2,000 gallons of fuel at $10 per gallon, plus $1,000 for each of the eleven trucks containing the dyed fuel. *See* I.R.C. § 6715(b)(1)(A)-(B). On March 11, 1997, ConEd paid the penalty in full.

ConEd thereafter filed an administrative appeal with the IRS, arguing that any violation of § 6715 was inadvertent and thus not subject to penalty. ConEd also challenged the penalty calculation. On May 13, 1997, the IRS denied ConEd's administrative appeal.

### C. *Proceedings below*

ConEd commenced this action for a refund on June 13, 1997. As in the administrative appeal, ConEd argued that its conduct was not properly subject to the penalty clause of § 6715 and in any event that the IRS had incorrectly calculated the applicable penalty. ConEd and the government cross-moved for summary judgment following the completion of discovery. The district court denied ConEd's motion for summary judgment and granted the government's motion in substantial part. *See Consolidated Edison Co. v. United States*, 34 F.Supp.2d 160, 162 (S.D.N.Y.1998) (*"ConEd"*); *see also Consolidated Edison Co. v. United States*, No. 97 Civ. 4366(MBM), 1999 WL 420506, at *2 (S.D.N.Y. June 23, 1999) (on the government's motion for reconsideration, granting full summary judgment in favor of the government); *Consolidated Edison Co. v. United States*, No. 97 Civ. 4366(MBM), 1999 WL 688456, at *1 (S.D.N.Y. Sept.2, 1999) (denying ConEd's motion for reconsideration). In doing so, the district court held that under the plain language of § 6715, ConEd's lack of intent and its employees' ignorance concerning the import of red dye were immaterial; all that mattered was ConEd's actual possession or use of the fuel and its constructive knowledge that the fuel was

dyed. *See ConEd,* 34 F.Supp.2d at 164–65. The district court further held that the act of transporting the fuel from the holding tank to the trucks' tanks constituted "use" of the fuel; that each act of possession or use was a separate "act" for the purpose of the penalty provision; and thus that the $11,000 penalty for "using" the fuel in the trucks was properly added to the $20,000 penalty for possessing the fuel in the holding tank. *See id.* at 165–67.

The $31,000 amount of the penalty only partly reflects the penalty's gravity for ConEd: successive penalties under § 6715 are calculated by multiplying the amount otherwise due under § 6715(b)(1) by the total number of penalties imposed on the taxpayer. *See* I.R.C. § 6715(b)(2). Should another penalty be imposed on ConEd, the existence of this prior penalty would double the amount of that penalty.

## DISCUSSION

ConEd's claims are three: (i) that it could not be subject to a penalty under § 6715(a)(2) because the events alleged by the IRS did not constitute a violation of that statute; (ii) that even if its conduct was properly subject to a § 6715(a)(2) penalty under the circumstances envisioned by the district court, a disputed issue remained as to a factual matter material to that penalty, precluding summary judgment; and (iii) that in any event the IRS miscalculated the penalty due. We consider the first two arguments together because they are inextricably linked; we decline to reach the third.[1]

As an initial matter, we note that jurisdiction is proper. ConEd having paid the contested penalty and filed a Claim for Refund and Request for Abatement, the district court had jurisdiction under 28 U.S.C. § 1346(a)(1) and I.R.C. § 7422(a) to review the IRS's imposition of the penalty. This Court has jurisdiction to review the

final order of the district court pursuant to 28 U.S.C. § 1291. Notice of appeal was timely filed on July 22, 1999.

### A. *Standard of Review*

This Court reviews *de novo* the district court's decision to grant summary judgment. *See Retrofit Partners I, L.P. v. Lucas Indus., Inc.,* 201 F.3d 155, 159 (2d Cir.2000). Summary judgment is improper if there are genuine issues of material fact; otherwise, judgment as a matter of law for the moving party is warranted. *See Sharkey v. Ultramar Energy Ltd.,* 70 F.3d 226, 228–29 (2d Cir.1995). All ambiguities must be resolved, and all inferences drawn, in favor of the nonmoving party. *See id.*

### B. *Violation of § 6715(a)(2)*

■ ConEd argues that it should not be subject to the penalty imposed under § 6715 because (i) having ordered clear fuel—and duly paid the applicable tax—it had no "reason to know" that it had committed a violation of I.R.C. § 6715(a)(2); and (ii) since it never used non-taxable fuel at the College Point fueling station in the past, it had no duty to educate the employees at that location as to the significance of red dye. ConEd also specifies the following disputed material facts: (i) whether Beers saw the delivery ticket prior to the delivery; (ii) whether Bertucco saw the "RED DYED" stamp on the ticket; and (iii) "what knowledge a similarly situated corporate taxpayer in [ConEd]'s position should possess" upon an employee's examination of the delivery ticket.

The statute is not as complex as ConEd contends: a penalty is to be imposed whenever "any dyed fuel is held for use or used by any person for a use other than a nontaxable use and such person knew, or had reason to know, that such fuel was so

---

1. The district court ruled that the fuel transfer to trucks' tanks constituted fuel "use," seemingly without regard to whether the trucks were put to any use (such as highway driving) for which taxed fuel is required—indeed, without regard to whether the trucks were ever used at all following fueling, or simply re-parked. ConEd does not challenge this ruling.

dyed." I.R.C. § 6715(a)(2). ConEd concedes that dyed fuel was (at least) held "for a use other than a nontaxable use," so the only question (bearing on ConEd's violation of § 6715(a)(2)) is whether ConEd "knew, or had reason to know, *that [the] fuel was so dyed." Id.* (emphasis added). It is immaterial whether ConEd's employees understood the significance of red coloration or that a violation or other consequence would stem from ConEd's possession or use of red-dyed fuel. Also immaterial was ConEd's purity of heart, or actual payment of the applicable excise taxes. All that matters here under this statute is ConEd's awareness that the fuel was dyed. ConEd is therefore not entitled to judgment as a matter of law on the bases asserted.

■ *Respondeat superior.* As to whether ConEd "knew, or had reason to know, that [the] fuel was so dyed," I.R.C. § 6715(a)(2), it is undisputed that ConEd's knowledge is imputed from that of its employees. This Court stated in *Apollo Fuel Oil v. United States,* 195 F.3d 74 (2d Cir. 1999) (per curiam), that:

> [Appellant] as a corporate entity had reason to know of the presence of red-dyed fuel intentionally placed in its truck's propulsion tank. In general, when an agent is employed to perform certain duties for his principal and acquires knowledge material to those duties, the agent's knowledge is imputed to the principal. Thus, "it is elementary" that a corporation "can be guilty of 'knowing' ... violations of regulatory statutes through the doctrine of *respondeat superior."*

*Id.* at 76–77 (quoting *United States v. A & P Trucking Co.,* 358 U.S. 121, 125, 79 S.Ct. 203, 206, 3 L.Ed.2d 165 (1958)) (internal citations omitted). The question is whether ConEd's employees—Bertucco or Beers

or both—"knew[ ] or had reason to know" that the fuel delivered was dyed fuel.[2] I.R.C. § 6715(a)(2).

■ *Reason to know.* As used in the Internal Revenue Code, the phrase "reason to know" is a term of art: one has "reason to know" "what a reasonable person in the [defendant's] ... subjective position would have discovered." *United States v. Campbell,* 897 F.2d 1317, 1321–22 (5th Cir.1990) (quoting *Sanders v. United States,* 509 F.2d 162, 166 (5th Cir.1975)) (internal quotation marks omitted; alterations in original); *accord United States v. Estate Preservation Servs.,* 202 F.3d 1093, 1103 (9th Cir.2000). This construction of "reason to know" comports with this Court's "reasonably prudent taxpayer" standard, adopted in *Hayman v. Commissioner,* 992 F.2d 1256, 1261–62 (2d Cir. 1993) (citing *Price v. Commissioner,* 887 F.2d 959, 963–65 & n. 9 (9th Cir.1989)).

■ In the context of federal taxation, whether a reasonable person would have had "reason to know" is a question of fact. *See Hayman,* 992 F.2d at 1260 (implying that "reason to know" is a "finding[ ] of fact"); *Bankers Trust Co. v. Crawford,* 781 F.2d 39, 44 (3d Cir.1986) (referring to "reason to know" as a "finding[ ] of fact"); *see also Taylor v. Commissioner,* 43 F.3d 1483, 1994 WL 704748, at \*2 (10th Cir. Dec.19, 1994) (unpublished table decision, available for citation according to 10th Cir. Local Rule 36.3) (referring to "reason to know" as a "finding of fact").

■ *Constructive knowledge.* The government argues that Bertucco had "reason to know" of the presence of dyed fuel because (i) he signed the stamped ticket, and (ii) as a matter of settled law, his act of signing the ticket charged him with

---

**2.** The moment Metro informed ConEd that it had erroneously delivered red-dyed fuel, ConEd obviously "knew, or had reason to know, that [the] fuel was so dyed." I.R.C. § 6715(a)(2). Because ConEd immediately shut the pumps down and began a remediation program upon receiving Metro's phone

call, however, the red-dyed fuel was at that point no longer held or used "for a use other than a nontaxable use." *Id.* Rather, it was held for removal, not "use." ConEd's knowledge of the dyed status of the fuel during the remediation efforts therefore does not itself give rise to a violation of I.R.C. § 6715(a)(2).

constructive knowledge of its contents. The district court agreed:

> Here, regardless of whether Bertucco ... paused to read the whole delivery ticket, [he] had constructive knowledge of the presence of dyed diesel by virtue of the "RED DYED" stamp.

*ConEd*, 34 F.Supp.2d at 165. The district court equated constructive knowledge with "reason to know," an equation the parties do not contest, and that is consistent with precedent. *See, e.g., Holzapfel v. Town of Newburgh*, 145 F.3d 516, 524 (2d Cir.1998) (holding that constructive knowledge satisfies the "reason to know" standard); *Hayman*, 992 F.2d at 1262.

■ In general, individuals are charged with knowledge of the contents of documents they sign—that is, they have "constructive knowledge" of those contents. In *Hayman*, for example, this Court held that one who asserts an innocent-spouse defense to tax evasion cannot claim ignorance of the contents of tax returns she signed: "Although Hayman claims to have signed the returns without reading them, she nevertheless is charged with constructive knowledge of their contents." *Hayman*, 992 F.2d at 1262 (citing *Schmidt v. United States*, 5 Cl.Ct. 24, 27 (1984); *Levin v. Commissioner*, 53 T.C.M. (CCH) 6, 8 (1987)); *see also Shaw v. AutoZone, Inc.*, 180 F.3d 806, 811 (7th Cir.1999) (charging a party with constructive knowledge of a booklet she never read on the basis of her signature on a form stating that she had read the booklet) (citing *Betaco, Inc. v. Cessna Aircraft Co.*, 32 F.3d 1126, 1136 (7th Cir.1994) ("As a result of [the duty to read the contract] a person who signs a written contract is bound by its terms regardless of his or her failure to read and understand its terms." (internal quotation marks and citation omitted))). Under this standard, Bertucco (and by *respondeat superior*, ConEd) is charged with knowledge of the contents of the ticket he signed. This renders immaterial two disputed fact issues cited by ConEd: since Bertucco had constructive knowledge of the ticket's contents, it is immaterial (i) whether Bertucco actually saw the "RED DYED" stamp, and (ii) whether Beers saw the stamped ticket, and thereby had knowledge of its contents.

■ *The disputed issue of material fact.* Bertucco's signature on a ticket stamped "RED DYED" entailed constructive knowledge *of the ticket's contents*, but does not necessarily entail constructive knowledge *that the fuel was dyed red.* A factfinder may consider the ticket as a whole in deciding whether a reasonably prudent taxpayer familiar with the ticket's contents would have reason to know that the fuel was red. And the ticket conveyed, at best, mixed signals.

One signal is the "RED DYED" stamp. If the ticket conveyed nothing else about the fuel color, that stamp might be a sufficient reason to know that the fuel was dyed. The IRS emphasizes that the ticket contains two pre-printed warnings that possession of red-dyed fuel for taxable purposes is illegal. But these warnings alert the reader to the importance of the fuel color without saying what color the fuel is; they are printed on all delivery tickets, regardless of the tax status of the fuel delivered; they are attached by asterisks to the box marked "PRODUCT"; and by their terms they apply only "IF [the delivered] PRODUCT IS # 2, # 4 OIL OR OFF ROAD/RED DIESEL"—which, according to the very entry tagged with these warnings, this delivered product was not.

The ticket *also* conveyed signals that would indicate to a taxpayer that the fuel was *clear.* The ticket specifies the tax rate payable on the kind of fuel delivered, and the amount of tax due for the delivery. These entries obviously indicate clear (*i.e.*, taxable) fuel. In another box, the ticket specifies the product as "L.S.DIESEL"—that is, *clear, taxable*, low-sulphur diesel fuel.

Under these circumstances, Bertucco and ConEd should not be charged with constructive knowledge of the fuel coloration *as a matter of law.* There is a disputed issue of material fact as to what a

reasonably prudent taxpayer would have reason to know from examination of the ticket. If Bertucco had no "reason to know" that red-dyed fuel had been delivered, and therefore *no* ConEd employee had "reason to know" that red-dyed fuel had been delivered, then ConEd lacked that knowledge as well.

The dissent argues that the "RED DYED" stamp on the ticket was sufficient to establish ConEd's "reason to know" as a matter of law, notwithstanding multiple contra-indications on the face of the same ticket, and is concerned that our decision might unintentionally facilitate the doings of organized crime. We conclude only that the contradictory ticket does not give "reason to know" at least where (as here) the course of business is to use clear fuel and pay tax on it, one contra-indication on the face of the ticket is a tax charge that is paid or uncontested, and there is no circumstance outside the four corners of the ticket that corroborates or reinforces the "RED DYED" stamp. Such a conclusion can give no comfort to organized crime.

### C. Calculation of the penalty

Because we conclude that the district court erred in granting summary judgment, we need not reach the question of whether the IRS properly calculated the penalty against ConEd.

### CONCLUSION

The judgment of the district court is vacated, and the case is remanded to the district court for further proceedings consistent with this opinion.

STRAUB, Circuit Judge, dissenting:

I respectfully dissent.

The majority is skeptical of the government's enforcement of I.R.C. § 6715 against ConEd under the circumstances of this case.[1] *See, e.g., ante* at 368 (stating that IRS compliance officer "sprang into action" upon learning "that an innocent

mistake, committed without tax avoidance or evasion, without concealment, and without harm, was about to be corrected voluntarily, immediately and without consequence"). However, Congress sought to attack a serious problem when it enacted the stringent penalty provisions found in § 6715. Throughout the 1980s and early 1990s, theft and evasion of gasoline and diesel fuel taxes resulted in spectacular revenue losses to federal and state governments. Organized crime played a large role in fuel tax hijacking. By one account, organized crime had a hand in stealing as much as $8 million a month in fuel taxes for many years in the New York area. *See generally* Ron Hagquist & Dawn Doyle, *Fuel Tax Hijacking: How State Governments are Responding*, 15 Gov't Fin. Rev. 45 (1999); *see also* 139 Cong. Rec. E1486 (daily ed. June 14, 1993) (statement of Rep. Istook) (discussing the scale of the diesel excise tax evasion problem); 138 Cong. Rec. H7188–89 (daily ed. Aug. 3, 1992) (statement of Rep. Matsui). At the time of enactment of § 6715 in 1993, the level of evasion and theft of federal diesel fuel taxes was estimated by the U.S. Department of Transportation to represent between 15 and 25 percent of the total amount of diesel fuel consumed, amounting to hundreds of millions of dollars in revenue losses each year. *See* H. Rpt. 103–111, at 748 (1993); *Fuel Tax Evasion and Highway Trust Shortfall: Hearing Before the Subcomm. on Investigations and Oversight of the House Comm. on Public Works and Transportation*, 103rd Cong., 1994 WL 417181 (Aug. 10, 1994) (statement of Jane F. Garvey, Deputy Administrator, Federal Highway Admin., U.S. Dep't of Transportation).

Against this backdrop of massive revenue losses, Congress enacted enforcement measures that, as the majority correctly observes, include rather stringent penalty provisions. As the majority notes, the statute is "not as complex as ConEd contends." *Ante* at 369. To the contrary, its

---

**1.** Unless otherwise noted, I adopt the various abbreviations and acronyms utilized by the majority.

strict provisions are quite straightforward. Section 6715 exacts a penalty whenever "dyed fuel is held for use or used ... for a use other than a non-taxable use" by one who has "reason to know[ ] that such fuel was so dyed." I.R.C. § 6715(a)(2), 26 U.S.C. § 6715(a)(2). There is nothing ambiguous about this statutory language. If taxpayers have "reason to know" that the fuel being held for use is red-dyed, then they are imputed with constructive knowledge that they are holding red-dyed fuel—regardless of their understanding of the tax consequences of holding that red-dyed fuel or even their actual knowledge of whether the fuel is, in fact, red-dyed.

Here, ConEd concedes that the dyed fuel was both "held" and "used" within the meaning of the statute. As the majority recognizes, the only relevant question therefore concerns whether ConEd had reason to know that the fuel was red-dyed. "All that matters ... is ConEd's awareness that the fuel was dyed"—its understanding of the tax consequences of that coloration and its "purity of heart" are simply irrelevant. *Ante* at 370. The delivery ticket presented in this case (which is appended to this opinion) revealed to ConEd in bright red, 18–point letters stamped across the center of the ticket that the delivered fuel was "RED DYED." The ticket also contained two additional disclosures, one on the front and one on the back, stating clearly that possession of red-dyed fuel under certain circumstances is illegal. While the majority holds that the delivery ticket conveyed "mixed signals" since it "obviously indicate[d]" that tax was to be paid on the delivered fuel, *ante* at 371–72, the mere presence of this notation on the delivery ticket is insufficient to create a genuine issue of material

fact as to ConEd's "reason to know" that the fuel was red-dyed. In order to avoid summary judgment in favor of the government, ConEd "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Gallo v. Prudential Residential Services, L.P.*, 22 F.3d 1219, 1223 (2d Cir.1994) ("When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper."). Rather, ConEd must provide sufficient affirmative indication "that [its] version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.*, 112 F.3d 98, 101 (2d Cir.1997) (internal quotation marks and citations omitted).

ConEd has failed to meet this burden. Given the bold red stamp across the face of the delivery ticket plainly indicating that the fuel was "RED DYED," no reasonable fact-finder could conclude that a reasonably prudent taxpayer in ConEd's position lacked "reason to know" that the fuel was red-dyed. Rather, the evidence remains "so one-sided that" the government "must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). ConEd is a sophisticated operator of several fueling stations, and it does, in fact, use red-dyed fuel at other facilities. The undisputed facts of this case leave no question—not even an inference—but that ConEd had "reason to know" that the fuel was red-dyed.

Accordingly, I would affirm the District Court's judgment.

374

## Appendix to Dissenting Opinion of Judge Straub

**PLEASE TAKE NOTICE:**

Buyer must notify seller in writing of any claim whatsoever, regarding the product delivered, including but not limited to objections to price or quality, within THIRTY (30) DAYS, following its delivery. Failure to notify seller in writing within the 30 day period will be deemed an admission by your that the product delivered was satisfactory in all respects, that you have accepted it without objection, and that you have no defense(s) to the payment for the same, either legal or equitable.

++NOTE IF PRODUCT IS #2, #4 OIL OR OFF ROAD / RED DIESEL – THIS PRODUCT IS DYED DIESEL FUEL NON TAXABLE USE ONLY. PENALTY FOR TAXABLE USE.

EMERGENCY RESPONSE INFORMATION ERG#27 (Emergency Spill Tel.# - 24 Hr. 718-309-7772)

HAZARD WARNINGS PG III Products: #2, #4, #5, Fuel Oil, Diesel (PG 1993) & Kerosene (UN 1223)

CAUTION: COMBUSTIBLE LIQUID. Keep away from heat, sparks or flame. Bond and ground transfer equipment and containers. In case of fire, use foam, dry chemical, or carbon dioxide.

Ingestion causes irritation to throat and stomach. Large quantities can cause coma and death. Affects central nervous system. Do no induce vomiting. Get medical attention.

Contact may cause eye, skin, and respiratory irritation.

Overexposure to vapors or mists may result in symptoms from headache to loss of coordination.

EXHIBIT
Defendants E5
1/11/17 PW